ADKINS, Justice.
We have for review an order of appellee, the Florida Public Service Commission (hereinafter the PSC), relating to the rates of appellant, Florida Power Corporation (hereinafter FPC), a public utility providing electric service. Jurisdiction is pursuant to article V, section 3(b)(2), Florida Constitution.
In March of 1978, FPC’s Crystal River No. 3 nuclear power plant (hereinafter CR3) was shut down to investigate the cause of certain alarms. A coupling of a burnable poison rod assembly had broken loose and been carried into the steam generator, resulting in severe damage and requiring a major cleanup of the system.
The reactor core had to be defueled and damage to the steam generator assessed. Once the fuel was removed from the reactor core FPC began to replace the fuel assemblies. During replacement of the fuel assemblies various malfunctions developed in a fuel transfer device and extensive repair was required. After the necessary repairs the fuel transfer device was tested with a load. For this purpose a test weight weighing approximately 2000 pounds was selected by plant personnel. A work crew lowered the test weight into the transfer device. When the next work crew arrived to remove the test weight, the employee in charge, a plant engineer, instructed the crew to lift the test weight with a “fish hook.” This particular hook was designed with a capacity of approximately 150 pounds but was not labeled as such. As the weight was lifted the hook straightened out dropping the test weight and damaging a fuel assembly.
At issue in this case is who should bear the burden of the replacement fuel costs ($12,859,251.00) collected by FPC subject to refund. The PSC argues that this is the amount which must be returned by FPC to the ratepayers because of the impact of the dropped test weight incident on the outrage of CR3. The PSC claims that 55 days were added to the outage as a result of this incident.
FPC contends, however, that the dropped test weight incident contributed no more than fourteen days to the outage.
In its order no. 9775 issued on January 30, 1981, the PSC found, inter alia, that:
3. Procedures governing the work activity involving the use of the test weight device were deficient, and the planning and supervision of the project were inadequate. These are functions of company management, and Florida Power Corporation must bear responsibility for the consequences of the incident in terms of replacement fuel costs.
4. Based upon the evidence, ... 55 days of the forced outage must be associated with the dropped test weight incident. The company’s effort to attribute only 14 days to the incident is not supported by competent, credible evidence.
5. The differential between actual fuel costs and those which would have been incurred had Crystal River No. 3 *747 been available 55 days earlier totals $12,-859,251, which amount must be refunded with interest....
Central to the PSC’s conclusion that FPC should bear the responsibility for the dropped test weight incident is its finding that “... evidence that policies, decisions and procedures which were undisputedly the functions of management were lacking in this instance.” Order no. 9775 at 5. To support this finding the PSC relied on a notice of violation issued by the Nuclear Regulatory Commission (hereinafter NRC), as a result of the test weight incident.
The NRC’s notice of violation concluded as follows:
[T]he hook used to lift a 2050 lb. test weight in spent fuel pool (adjacent to nuclear fuel assemblies) was locally manufactured from non-certified material, was not load-tested or qualified prior to use, and was not tagged or marked as to the limitations on its use. The failure of this hook ... contributed to the damage to [the], fuel assembly.... This is an infraction....
Order no. 9775 at 5. (Reference to exhibit omitted.) This conclusion was premised on the required establishment of measures to prevent the use of incorrect or defective material in safety-related activities. The term “safety-related” refers to work involving the risk that radioactive material might be released outside the plant.
In order no. 9775 the PSC described FPC’s failure to treat as safety-related the work involving the test weight as “[t]he single most damaging indictment of those responsible for the activity.” Order no. 9775 at 6. It also found that a lack of adequate procedures led to the incident. Id. Additionally, the PSC concluded that “[i]n view of the proximity of nuclear fuel and of the fact that the test device contained lead, the gross failure by those who directed the use of the device to recognize that its use was safety-related is established virtually by definition.” Id.
We disagree with the PSC’s post-accident assessment of what should have been labeled safety-related. Our independent review of the record discloses that the particular task which resulted in the accident was but a small part of the extended repairs to the fuel transfer mechanism. The record further indicates that the repair work, per se, was not safety-related, and this was, in part, why the use of the test weight was not recognized as being safety-related.
We are mindful of the NRC’s notice of violation which criticized plant procedures for the labeling and testing of hooks, and of the report of FPC’s nuclear general review committee, (NGRC), which concluded that the repair work at CR3 was safety-related. However, the NRC’s notice and the NGRC’s report were both issued after the accident had occurred. Hindsight should not serve as the basis for liability in this instance.
Moreover, the NRC’s notice was concerned solely with safety-related matters, consistent with the NRC’s limited scope of responsibility for nuclear safety and the health of the general public from a radiological standpoint. The notice involved a very different risk and a much higher standard of care than were involved in this case.
The NGRC’s report also focused strictly on nuclear safety considerations. Furthermore, the principal purpose of the report was to reinforce and strengthen existing procedures, not to propose new ones. This is consistent with the purpose of the NGRC, a committee set up by FPC pursuant to NRC requirements. The purpose of the NGRC is to suggest improvements in procedures after an accident occurs. Its purpose is not to find fault.
After a careful review of the record and of the PSC’s order no. 9775, we believe that the PSC relied excessively on the NGRC report and the NRC notice of violation. While these documents are undoubtedly useful for numerous purposes, they should not serve as the primary source of evidence in a fault-finding determination. Such use of these documents would be analogous to using evidence of subsequent repairs and design modifications for the purpose of showing that the original design was faulty. This would clearly violate Florida’s strong public policy in favor of post accident investigations.
*748 We need not consider appellant’s other points on appeal.
Order no. 9775 is hereby reversed and this cause is remanded to the PSC for reconsideration in light of the views expressed in this opinion.
It is so ordered.
ALDERMAN, C.J., and BOYD, OVER-TON, McDonald and EHRLICH, JJ., concur.