502 A.2d 130

PENNSYLVANIA ELECTRIC COMPANY, Appellant,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Appellee,

Office of Consumer Advocate, et al., Intervenors.

METROPOLITAN EDISON COMPANY, Appellant,

v.

PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Appellee,

Office of Consumer Advocate, et al., Intervenors.

Supreme Court of Pennsylvania.

Argued May 14, 1985.
Decided Dec. 9, 1985.

Samuel B. Russell, W. Edwin Ogden, Reading, for appellant.

Bohdan R. Pankiw, Harrisburg, for appellee PUC Com'n.

Debra S. Miller, Craig Burgraff, David M. Barasch, Harrisburg, for intervenors Office of Consumer Advocate.

Oscar B. Brumback, Pittsburgh, for American Soc. of Utility Investors.

Maurice A. Frater, Harrisburg, for Abex Corp., et al.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This is an appeal from an order of the Commonwealth Court which affirmed orders of the Pennsylvania Public Utility Commission (PUC) in certain electric utility rate-setting cases. *Pennsylvania Electric Co. v. Pennsylvania Public Utility Commission,* 78 Pa.Commw.Ct. 402, 467 A.2d 1367 (1983). The cases arose as repercussions of the 1979 accident at the Three Mile Island nuclear generating station near Harrisburg, Pennsylvania. The accident involved the near melt-down of a nuclear reactor, and was the most serious in the history of nuclear power generating facilities in the United States. The Three Mile Island incident has had nationwide implications, not only with respect to the future of nuclear power generation in the United States, but also in relation to the resultingly imperiled financial viability of some of our nation's largest public utility companies. It is with this latter aspect of the incident, as regards the diminished financial viability of the companies that own the Three Mile Island station, that the instant appeal is concerned.

The appellants, Metropolitan Edison Company and Pennsylvania Electric Company, own 50% and 25% interests, respectively, in the Three Mile Island station. In 1979, shortly after the nuclear accident, the PUC set reduced permanent rates for these companies, and these new rates reflected the removal from the rate base of all costs associated with Unit 2, the unit involved in the accident, on the basis that Unit 2 had been so severely damaged as to render it no longer useful in the public service. This action was in accord with well-established principles that rates charged the public for utility services are to provide a return upon only such property of the utility as is used and useful in the public service. See 66 Pa.C.S.A. § 1310(d) (utility entitled to "fair return upon the fair value of the property of such

public utility, used and useful in its public service...."); *Scranton v. Scranton Steam Heat Co.*, 405 Pa. 397, 401, 176 A.2d 86, 88 (1961). See also *Denver Union Stock Yard Co. v. United States*, 304 U.S. 470, 475, 58 S.Ct. 990, 994, 82 L.Ed. 1469, 1475–1476 (1938) (Under the due process clause of the Fifth Amendment, a regulated utility "is entitled to rates, not per se excessive and extortionate, sufficient to yield a reasonable rate of return upon the value of property used, at the time it is being used, to render the services. But it is not entitled to have included any property not used and useful for that purpose." (citations omitted)).

At the time of the accident at Unit 2, another nuclear reactor at Three Mile Island, Unit 1, had been shut down for refueling. Following the accident at Unit 2, Unit 1 remained shut down by order of the Federal Nuclear Regulatory Commission. Shortly after ordering reduced rates based on the lack of continued usefulness of Unit 2, the PUC, in 1980, made a determination that Unit 1 was likewise no longer useful in the public service, because its return to service was not "imminent" or "certain," and, accordingly, the PUC established temporary reduced rates, reflecting the exclusion of all costs associated with Unit 1 from the companies' rate bases. These temporary reduced rates for Metropolitan Edison and Pennsylvania Electric were, on an annual basis, $26.9 million and $11.7 million less, respectively, than their existing rates. The companies filed complaints alleging that these new rates were unjust and unreasonable, and filed tariffs seeking substantial rate increases. In these tariffs, the companies sought to include in their rate bases costs and investments related to Unit 1, but the companies have not sought in this case to do the same with respect to the damaged reactor, Unit 2. Hearings were held before an Administrative Law Judge, and the decisions recommended by the Administrative Law Judge were adopted, with only minor modifications, by the PUC in 1981. The final PUC orders allowed Metropolitan Edison a rate increase, over and above the challenged temporary rates, of nearly $52 million (including $11 million

covering Unit 1 restart costs). Pennsylvania Electric was awarded an increase, over and above the temporary rates, of approximately $55.5 million (including $5.5 million covering Unit 1 restart costs). Metropolitan Edison and Pennsylvania Electric had sought larger rate increases, of $76.4 million and $67.4 million respectively. Appeals were taken to the Commonwealth Court, where the orders of the PUC were affirmed. The instant appeal ensued.

The issue presented in this appeal is a narrow one, namely whether the decision of the United States Supreme Court in *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) established a requirement, of constitutional dimension, that utility rates set by regulatory authorities be set at sufficiently high levels as to guarantee, irrespective of countervailing consumer interests, the continued financial integrity of the utilities concerned. In *Hope*, the United States Supreme Court addressed the considerations to be taken into account by the Federal Power Commission in setting "just and reasonable" rates for natural gas companies, as required under § 4(a) of the Natural Gas Act, 15 U.S.C. § 717. The Court noted that there were no applicable constitutional requirements more exacting than the requirement of "just and reasonable" rates set forth in the Act. 320 U.S. at 607, 64 S.Ct. at 290, 88 L.Ed. at 347. Indeed, in the Court's subsequent decision in *Permian Basin Area Rate Cases*, 390 U.S. 747, 770, 88 S.Ct. 1344, 1361, 20 L.Ed.2d 312, 338 (1968), *reh. den.* 392 U.S. 917, 88 S.Ct. 2050, 20 L.Ed.2d 1379 (1968), it was held that "the *just and reasonable* standard of the Natural Gas Act *'coincides'* with the *applicable constitutional standards* ... and any rate selected by the Commission from the broad zone of reasonableness permitted by the Act cannot properly be attacked as confiscatory." (emphasis added) (citation omitted). See also *Federal Power Commission v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585–586, 62 S.Ct. 736, 742–43, 86 L.Ed. 1037, 1049 (1942). It is to be noted that the constitutionally based requirement of "just and reasonable" rates, under the Fifth

and Fourteenth Amendments, is in effect embodied in terminology found in the Pennsylvania Public Utility Law, which governs the rates being challenged in the instant appeal. Indeed, in *Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Co.*, 492 Pa. 326, 337, 424 A.2d 1213, 1219 (1980), *cert. den.* 454 U.S. 824, 102 S.Ct. 112, 70 L.Ed.2d 97 (1981), we stated that the requirement of "just and reasonable" rates set forth in the Public Utility Law, 66 P.S. § 1141 (repealed 1978; reenacted at 66 Pa.C. S.A. § 1301), "confer[s] upon the regulatory body the power to make and apply policy concerning the appropriate *balance* between prices charged to utility customers and returns on capital to utility investors *consonant with constitutional protections* applicable to both." (emphasis added).

In discussing the considerations to be taken into account in applying the standard requiring "just and reasonable" rates, the Court, in *Hope*, emphasized that the focus of inquiry is properly upon the end result or "total effect" of the rate order, rather than upon the rate-setting method employed. 320 U.S. at 602, 64 S.Ct. at 287, 88 L.Ed. at 345. Describing the rate-setting process as a balancing process, involving the weighing of certain enumerated interests of the consumer and of the investor, the Court stated the following:

> The rate-making process under the Act, i.e., the fixing of "just and reasonable" rates, involves a *balancing of the investor and the consumer interests.* Thus we stated in the Natural Gas Pipeline Co. Case that "regulation does not insure that the business shall produce net revenues." ... [T]he *investor interest has a legitimate concern with the financial integrity of the company* whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock.... By that standard the return to the equity owner should be

commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.... The conditions under which more or less might be allowed are not important here.

320 U.S. at 603, 64 S.Ct. at 288, 88 L.Ed. at 345. In short, *Hope* sets forth a balancing test, like that which we described in *Pennsylvania Gas*, supra, for the determination of "just and reasonable" rates, to be applied with the aim of protecting consumers against exploitation at the hands of utility companies while seeking to preserve the financial integrity of utility companies. See *Federal Power Commission v. Memphis Light, Gas & Water Division*, 411 U.S. 458, 465–466, 93 S.Ct. 1723, 1728, 36 L.Ed.2d 426, 433 (1973). We do not believe, however, that the *Hope* decision stands for the proposition, urged by Metropolitan Edison and Pennsylvania Electric, that the end result of a rate-making body's adjudication *must* be the setting of rates at a level that will, in any given case, guarantee the continued financial integrity of the utility concerned.

Rather, the *Hope* decision requires only that the regulatory authority balance competing consumer and investor interests to determine "just and reasonable" rates. *Permian Basin Rate Cases*, 390 U.S. at 770, 88 S.Ct. at 1361, 20 L.Ed.2d at 338 ("[T]here can be no constitutional objection if the Commission, in its calculation of rates, takes fully into account the various interests which Congress has required it to reconcile.... [S]uch rates ... intended to 'balanc[e] ... the investor and the consumer interests,' are constitutionally permissible. *FPC v. Hope Natural Gas Co.*, supra [320 U.S.] at 603 [64 S.Ct. at 288], 88 L.Ed at 345."). The *Hope* decision does not indicate, however, that the investor interests described in the quoted excerpt from *Hope*, supra, are to supersede those of consumers in any case where what would otherwise be a "just and reasonable" rate would endanger the financial integrity of the utility. To

conclude otherwise would be to elevate the investor interests to a constitutionally guaranteed dimension, a result which was not indicated by *Hope* and its progeny.

The decision in *Hope* enumerated certain legitimate areas of concern for investors, these being that a company have sufficient revenue to cover operating and capital costs, that the return on equity be commensurate with returns on enterprises having similar risks, and that the company be able to maintain credit and attract capital. These investor interests are appropriate factors to be weighed in the balancing analysis under *Hope,* but they are not, in themselves, controlling, for other factors must be taken into account. As stated in *Permian Basin Area Rate Cases,* 390 U.S. at 790–791, 88 S.Ct. at 1372, 20 L.Ed.2d at 350,

> [The investor-interest criteria] remain pertinent, but they scarcely exhaust the relevant considerations.
>
> The Commission cannot confine its inquiries either to the computation of costs of service or to conjectures about the prospective responses of the capital market; it is instead obliged at each step of its regulatory process to *assess the requirements of the broad public interests* entrusted to its protection by Congress. Accordingly, the "end result" of the Commission's orders must be measured as much by the success with which they protect those interests as by the effectiveness with which they "maintain credit ... and ... attract capital."

(emphasis added) (footnote omitted). We find no authority, in *Hope* or in other decisions, indicating that broad public interests are to yield to the interests of investors whenever the financial integrity of a utility company is imperiled.

In cases where the balancing of consumer interests against the interests of investors causes rates to be set at a "just and reasonable" level which is insufficient to ensure the continued financial integrity of the utility, it may simply be said that the utility has encountered one of the risks that imperil any business enterprise, namely the risk of financial failure. The express language of the *Hope* decision weighs against regarding utilities as a protected class of business enterprises which are to be relieved of such normal business

risks. Specifically, it was stated in *Hope*, 320 U.S. at 603, 64 S.Ct. at 288, 88 L.Ed. at 345, that investment returns to utility owners "should be commensurate with returns on investments in other enterprises having corresponding *risks*." (emphasis added). In addition, the *Hope* decision observed, " 'regulation does not insure that the business shall produce net revenues.' [quoting *Federal Power Commission v. Natural Gas Pipeline Co.*, 315 U.S. 575, 590, 62 S.Ct. 736 [745], 86 L.Ed. 1037, 1052 (1942)]." 320 U.S. at 603, 64 S.Ct. at 288, 88 L.Ed. at 345. The risks which utilities are to bear were further noted in *Natural Gas Pipeline*, 315 U.S. at 590, 62 S.Ct. at 745, 86 L.Ed. at 1052, where it was stated that "the hazard that the property will not earn a profit remains on the company in the case of a regulated, as well as an unregulated business." Since the risk of nonprofitability remains upon regulated utility companies, it follows that the consequence of that lack of profitability, to wit diminished financial integrity, also rests upon utility companies. Indeed, the *Hope* decision accorded implicit recognition to the fact that, in determining "just and reasonable" rates, there may be circumstances in which investor interests in the financial integrity of the enterprise may fail to be fulfilled, for after noting the interest in providing rates of return that preserve financial integrity, the decision stated that the case before it was not one where it was important to address the "conditions under which more or less might be allowed...." 320 U.S. at 603, 64 S.Ct. at 288, 88 L.Ed. at 345.

If the impact of diminished financial integrity were shifted from utility companies to the consumers, as would be the case if the utilities were regarded as having a constitutionally guaranteed right to rates which would preserve their financial integrity, elevating their rates above those levels that would otherwise be regarded as providing a "just and reasonable" return on assets utilized in the public service, the result would effectively circumvent the longstanding principle, discussed supra, that property included in a rate base must be "used and useful" in the public service. Specifically, rate bases which had been determined through

the exclusion of non-useful property would be rendered superfluous because the resulting rates would have to be adjusted upwards, whenever the financial integrity of the enterprise was in peril, and the effect upon rates would be the same as if portions of the non-useful property, such as the Three Mile Island nuclear reactors, had not been excluded from the rate base in the first instance.

The "used and useful" concept came into existence long before the *Hope* decision was rendered, and it is not generally regarded as having been overridden by that decision. The concept continues to be of application in this Commonwealth. *Barasch v. Pennsylvania Public Utility Commission,* 507 Pa. 430, 490 A.2d 806 (1985). Recently, in *Barasch v. Public Utility Commission,* 507 Pa. 496, 491 A.2d 94, 104 (1985), we noted the legislature's longstanding policy that current ratepayers should shoulder only the costs of providing current utility service, with such costs to be determined by reference to such property as is "used and useful" in service to the public. Though not a decision focusing upon whether preservation of the financial integrity of a utility is constitutionally to be accorded precedence over adherence to the "used and useful" principle, the *Barasch* decision did set forth the following observations regarding the priority to be accorded the "used and useful" concept:

> Arguably tomorrow's consumers may be better served by requiring current ratepayers to infuse interest-free capital into our utilities through the collection of excess expenses from today's ratepayers. This may also reduce the need for additional borrowing in the capital market, improve the bond rating of utilities and lower the cost rate for common equity. However, if utility rates are to reflect such a capitalization requirement from current consumers to protect the financial integrity of the system for the future, that is a matter for the Legislature, not the courts or the Commission, to decide.

507 Pa. at 516, 491 A.2d at 104.

The "used and useful" principle is soundly based, for it serves to protect consumers from exploitation, and it com-

ports with the view that, in fairness, consumers should not be required to buoy up failing utility companies by being required to, in effect, provide public subsidies for utility properties that are not useful in the public service. If the *Hope* decision were to be interpreted as providing constitutional guarantees for the achievement of investor interests, the "used and useful" principle would have to yield, at least in exceptional situations where the financial integrity of a utility is imperiled, but we do not perceive from *Hope* that investor interests are to be accorded such a guaranteed status.

In summary, therefore, we hold that the *Hope* decision is to be interpreted as recognizing a constitutional requirement of "just and reasonable" utility rates, providing a return on used and useful property, with rates to be determined through a balancing of consumer and investor interests. The legitimate areas of investor concern, enumerated in *Hope*, are not, however, of constitutional dimension, but are among the factors to be taken into account in the balancing of interests process.[1]

Aside from the analysis heretofore presented, additional and independent support for this holding may be discerned from the action of the Supreme Court of the United States in regard to a decision of the Appellate Division of the Superior Court of New Jersey. In the case of *In re: Jersey Central Power & Light Co.*, No. A-162-81T2 (July 28, 1983), *cert. den.* 95 N.J. 217, 470 A.2d 433 (1983), the Superior Court of New Jersey was presented with facts, and legal issues, that were precisely the same in all relevant respects as those of the instant case. Specifically, Jersey

---

**1.** Examination of the instant PUC decisions reveals that they reflect a balancing of consumer and investor interests. Metropolitan Edison and Pennsylvania Electric seek to have this case remanded to the PUC for further findings of fact, however, asserting that the findings of fact heretofore submitted by the PUC, pursuant 66 Pa.C.S.A. § 703(e), are insufficient to permit appellate review as to whether constitutionally guaranteed investor interests set forth in *Hope* have been satisfied by the PUC's rate orders. In view of our determination that *Hope* did not establish investor interests of constitutional dimension, any need for such a remand has been obviated.

Central Power and Light Company challenged rates set by the Board of Public Utilities, after the Board had excluded from the rate base the company's 25% ownership interest in the non-useful Unit 1 reactor at Three Mile Island. Asserting a jeopardized financial status, the company raised the same argument, based on *Hope,* as Metropolitan Edison and Pennsylvania Electric have raised in the present case, namely that the investor interests enumerated in *Hope* are of constitutional dimension. The Superior Court of New Jersey rejected that assertion, and announced a holding *identical* to that which we have reached presently.

The Supreme Court of New Jersey declined to review the decision, and an appeal was taken to the Supreme Court of the United States. That appeal was subsequently dismissed for want of a substantial federal question. *Jersey Central Power & Light Co. v. Board of Public Utilities,* 466 U.S. 947, 104 S.Ct. 2146, 80 L.Ed.2d 533 (1984). Unlike the grant or denial of certiorari, which expresses no intimation as to the merits of a case, a dismissal for want of a substantial federal question is, like a summary affirmance, a decision on the merits. *Ohio ex rel. Eaton v. Price,* 360 U.S. 246, 247, 79 S.Ct. 978, 3 L.Ed.2d 1200, 1202–1203 (1959) (opinion of Mr. Justice Brennan). See also *Appeal of Kartorie,* 486 Pa. 500, 503, 406 A.2d 746, 747–748 (1979). The Supreme Court of the United States has, therefore, through dismissal of the *Jersey Central* appeal, stated implicitly its approval of the holding in that case, and our holding in the instant case is identical to that which was approved in *Jersey Central.*

Order affirmed.

## JUDGMENT

ON CONSIDERATION WHEREOF, It is now hereby ordered and adjudged by this Court that the Order of the Commonwealth Court is affirmed.

HUTCHINSON, J., did not participate in the consideration or decision of this case.

PAPADAKOS, J., concurs in the result.