538 A.2d 98

Philadelphia Electric Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued June 10, 1987, before President Judge CRUMLISH, JR. and Judges CRAIG, MACPHAIL, BARRY and COLINS.

*Robert H. Young,* with him, *Walter R. Hall, II, Donald F. Clarke* and *Anthony C. DeCusatis. Morgan, Lewis & Bockius,* Of Counsel: *Edward G. Bauer, Jr.,* Vice President and General Counsel, for petitioner.

*Louis G. Cocheres,* Assistant Counsel, with him, *Daniel P. Delaney,* Chief Counsel, for respondent.

*David Wersan,* Assistant Consumer Advocate, with him, *Susan Perkins Weston* and *Irwin A. Popowsky,* Assistant Consumer Advocates and *David M. Barasch,* Consumer Advocate, for intervenor, Office of Consumer Advocate.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., February 24, 1988:

Philadelphia Electric Company (PECO) appeals a Pennsylvania Public Utility Commission (PUC) order which, in pertinent part, disallowed approximately $58 million in replacement power costs incurred during certain outages at the Salem Nuclear Generating Station Unit 1 (Salem 1), the Peach Bottom Atomic Power Station Units 2 and 3 (Peach Bottom 2 and 3) and the Eddystone Power Station. The Office of Consumer Advocate (OCA) has intervened on behalf of the PUC in this appeal.

On July 19, 1983, the OCA filed a Petition for an Investigation and an Order to Show Cause, alleging imprudence as to PECO's entitlement claim to replacement power costs related to a 1983 Salem 1 outage. The PUC granted the petition and instituted the investigation. Four days of hearings were held before Administrative Law Judge (ALJ) DENNIS HARNISH.

Prior to the issuance of a recommended decision, the petition and order were consolidated with Energy Cost Rate (ECR) Statement No. 8 which proposed an increase of approximately $151 million in the ECR.[1] This amount purported to represent undercollections of energy costs associated with the 1983 Salem 1 outage, as well as projected costs attributable in large measure to a 1984 Salem 1 outage, 1983 and 1984 Peach Bottom 2 and 3 outages and a 1983-1984 Eddystone 1 outage. Complaints were filed by OCA and others;[2] the PUC

---

[1] Energy cost rate or ECR is a forecast mechanism through which the utility projects fuel costs for the forthcoming year. The PUC originally challenged PECO's use of the ECR in this proceeding but later abandoned it.

[2] The other complainants included the PUC's trial staff, the City of Philadelphia, the Philadelphia Area Industrial Energy Users' Group (PAIEUG) and the Consumer Education and Protective Association.

then suspended approximately $106 million of PECO's ECR request and conducted a consolidated investigation.[3] Following eleven days of hearings, ALJ GEORGE M. KASHI, who succeeded ALJ HARNISH, issued a Recommended Decision disallowing approximately $82 million of PECO's ECR request.

Upon review of exceptions, the Commission reduced the disallowance to $73 million, of which approximately $58 million is attributable to the five outages here at issue. We will review seriatim the factual scenario and legal conclusions for each outage.

### 1983 SALEM 1 OUTAGE

This outage occurred on February 25, 1983, and ended May 20, 1983. While attempting to bring the unit up to power, Public Service Electric & Gas Company (PSE&G), the operator of Salem 1,[4] experienced certain mechanical difficulties which necessitated a shutdown. Two automatic reactor scram breakers, designed to shut down the unit automatically in such circumstances, failed.[5] The unit was shut down manually, but the automatic shutdown failure went undetected until three days later, when the reactor scram breakers again failed. Based on these two unprecedented incidents, the Nuclear Regulatory Commission (NRC) in-

---

[3] Pursuant to a PUC order, the Commission's trial staff retained an outside consulting firm, Temple, Barker and Sloane, Inc., to assist in the investigation.

[4] PSE&G and PECO are joint owners of Salem, with PECO holding approximately a 42-percent ownership interest. PECO does not contest its liability as a joint owner despite PSE&G's role as plant operator.

[5] A component of the reactor scram breaker, the undervoltage trip attachment (UVTA), failed to respond as designed. The event known as an Anticipated Transient Without Scram (ATWS) was the first such failure in the history of the U.S. commercial nuclear industry.

stituted an investigation and ultimately found that the outage was caused by inadequate maintenance and supervisory practices.[6] On April 29, 1983, the NRC authorized PSE&G to restart Salem 1, but further delays occurred due to shellfish infestation found in certain cooling water lines.

In a lengthy analysis, the PUC denied replacement power costs based on its finding that PSE&G had failed to exercise "the high degree of care" which it determined was required of á public utility in the operation of a nuclear generating facility. PUC opinion, pp. 54-56.

PECO's principal contention is that the PUC erroneously adopted a standard of review equivalent to the strict standard applied by the NRC. PECO further argues that under a properly applied "prudence" standard, substantial evidence supports its position that reasonable procedures were . followed and prudent choices were made to maintain the units and to minimize the length of the outage, thereby reducing the necessity of purchasing replacement power.[7]

The PUC's authority to review the internal management decisions of a utility company in a rate proceeding

---

[6] The NRC imposed an $850,000 civil fine on PECO and PSE&G, the largest such fine ever imposed. The sanction was not appealed.

[7] PECO relies heavily upon the New Jersey Board of Public Utilities decision concerning PSE&G's liability emanating from the 1983 Salem 1 outage. The New Jersey tribunal determined essentially that PSE&G had acted prudently in all respects and denied replacement power costs only as to the period in which the NRC's investigation was extended due to its concerns over certain management activities.

While we recognize the potential for inconsistent results, we do not believe that this is of major consequence, as each regulatory body was separately presented the facts of the case and was entitled to weigh the evidence independently and make its own credibility determinations.

is limited. It may not interfere with such decisions unless it finds an abuse of the utility's managerial discretion. *National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission,* 76 Pa. Commonwealth Ct. 102, 464 A.2d 546 (1983). Such abuse must be determined on the basis of what the utility's management knew or should have known at the time of the decision at issue. *Id.* Judgment by hindsight is prohibited. *Pittsburgh v. Pennsylvania Public Utility Commission,* 370 Pa. 305, 88 A.2d 59 (1952).

In formulating its standard of review, the PUC stated:

> In the case of nuclear plants, in particular, the high degree of care imposed upon PECO under the NRC standards, in our opinion, are [sic] equally applicable to the degree of care required of PECO under the reasonable standard or prudency [sic] for rate determination purposes. . . . The very magnitude of the horrendous cost, relatively speaking, of replacement power in the event of a nuclear generation outage, which PECO claims its customers should bear, compels the conclusion that PECO, under the reasonable person doctrine or standard, must operate its generation with a high degree of care. We conclude that a reasonable person operating a nuclear generation plant would in fact operate the plant with a high degree of care in order to minimize the necessity of purchasing costly replacement power. This degree of care is closely akin to the highest degree of care as generally understood to apply in certain areas of negligence law.

PUC opinion, p. 16.

Pursuant to its authority to ensure the safe operation of nuclear facilities and to address the tremendous risks

nuclear facilities pose to the public health, safety and welfare, the NRC requires that plant operators exercise a high degree of care in designing, maintaining and operating all aspects of a facility. However, we believe that this heightened standard of care which the PUC attempts to extract from the field of tort law is not applicable in a utility rate proceeding. *See Florida Power Corp. v. Public Service Commission,* 424 So.2d 745 (Fla. 1982).

The primary purpose of rate proceedings is not to insure public safety but to regulate the economic relationship between a utility and the public and to protect the public from unreasonably high utility costs. We discern an incompatibility of standards between the strict NRC requirement of a high degree of care as to plant safety and an equally high PUC standard as to the minimization of replacement power costs. The simultaneous imposition of these two standards would, in effect, require the utility to practice flawless safety techniques while optimizing, almost absolutely, production capacity. Such a stringent dual standard approaches that of strict liability, a principle far removed from the standard of imprudence previously enunciated by this Court. *See National Fuel Gas Distributing Corp.*

Therefore, we hold that in a rate proceeding involving the ongoing operation of a nuclear facility, the utility is required to demonstrate only that it did not abuse its managerial discretion, *i.e.,* that its decisions as to optimizing energy production within federal regulatory constraints were reasonable and prudent given the facts known to it at the time. To the extent that the PUC imposed a higher standard of care, it erred as a matter of law. Accordingly, we vacate that portion of the PUC order and remand for consideration under the proper standard as enunciated herein.

1984 SALEM 1 OUTAGE

This second Salem 1 outage occurred between February 24, 1984, and May 31, 1984. The record discloses that incompletely cured resins caused certain stator coils to vibrate, eventually resulting in fatigue failure and generator shutdown. It is essentially undisputed that the defective manufacture of the coils was responsible for their ultimate failure. The PUC concluded, however, that the replacement power costs associated with this outage (approximately $27 million) were to be borne by the utility rather than the ratepayers, based on its determination that the ratepayers were not at fault and that PECO was the party most capable of pursuing legal and contractual remedies against the manufacturer, Westinghouse Electric Corporation (Westinghouse).

PECO advances several arguments. It contends that the PUC erroneously relied on two of its earlier decisions, *Pennsylvania Public Utility Commission v. Metropolitan Edison Co.*, 50 Pa. P.U.C. 82 (1976) *(Met Ed I)* and *Pennsylvania Public Utility Commission v. Metropolitan Edison Co.*, 53 Pa. P.U.C. 225 (1979) *(Met Ed II)*, to find PECO vicariously liable for Westinghouse's defective manufacture of the stator coils.[8] PECO maintains that such a "policy" decision is improper as it indiscriminately shifts all risk of manufacturing defects to

---

[8] In pertinent part, the PUC stated:

We do not share PECO's interpretation of the Met-Ed cases, supra. ALJ KASHI accurately stated our holding in Met-Ed when he concluded: 'the Commission concluded that even if Met-Ed's contractor, and not Met-Ed, was responsible for the improper installation, Met-Ed's *ratepayers* were certainly fault-free, and therefore should not be required to pay for the portion of the plant representing the imprudently incurred costs.'

PUC opinion, pp. 72-73.

the utility, thereby rendering it the guarantor of all pur-
chased equipment. *See Aizen v. Pennsylvania Public
Utility Commission,* 163 Pa. Superior Ct. 305, 60 A.2d
443 (1948) (PUC cannot rely on policy alone to disallow
costs.) Moreover, PECO maintains that by exercising
such a policy-making prerogative, the PUC is given es-
sentially unlimited discretion in determining rate liabil-
ity based on risk apportionment rather than established
principles of reasonableness and prudence. This, PECO
argues, deprives it of due process of law.

The PUC and the OCA respond that PECO was
permissibly burdened with the instant replacement
power costs based on the prerogative utilities exercise
to investigate and contract with potential bidders, to
oversee and supervise ongoing contractor activities, and
to pursue contractual or legal remedies should there be
a failure of performance such as occurred here. It is also
argued that the PUC permissibly exercised its authority
to make and apply policy as to the appropriate balance
between consumer and investor interests, *Pennsylvania
Electric Co. v. Pennsylvania Public Utility Commission,*
509 Pa. 324, 502 A.2d 130 (1985).[9] Further, the PUC
and OCA assert that by investing in PECO, its share-

---

[9] In *Pennsylvania Electric,* our Supreme Court stated:
> In cases where the balancing of consumer interests against the interests of investors causes rates to be set at a 'just and reasonable' level which is insufficient to ensure the continued financial integrity of the utility, it may simply be said that the utility has encountered one of the risks that imperil any business enterprise, namely the risk of financial failure. The express language of the Hope decision weighs against regarding utilities as a protected class of business enterprises which are to be relieved of such normal business risks.

*Id.* at 331-332, 502 A.2d at 134. The *Hope* decision refers to *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591 (1944).

holders are more aware than the ratepayers of the hazards of the nuclear industry and have therefore assumed more of the risk of its unfortunate business decisions. *See Commonwealth Electric Co. v. Department of Public Utilities,* 397 Mass. 361, 491 N.E.2d 1035 (1986). Finally, it is noted that by imputing imprudence in this case PECO is encouraged to oversee more diligently its third-party contractors in the future.

The theory of vicarious or imputed liability, adopted by the PUC, actually originates in agency law. To find a non-negligent party vicariously liable for the acts of another, the general rule is that the party to whom liability is to be imputed must exercise a significant right or degree of control over the negligent party. W. Prosser, Law of Torts §69 (4th ed. 1971). This record reveals several indicia of control upon which one might find it reasonable to impute liability to PECO. For example, the existence of the contract for the stator coils, the ongoing communications between PSE&G and Westinghouse concerning the coils, and PECO's apparent efforts to obtain compensation from Westinghouse for the stator coil failures each suggests that PECO exercised a significant degree of control over Westinghouse so as to permit an imputation of liability.

The PUC's decision, however, fails to make discernable findings of fact concerning the indicia of control which PECO may or may not have exercised. Rather, its decision appears to rely solely on the lack of ratepayer fault to justify the cost allotment to PECO. While the *Met Ed I* and *II* decisions are cited to provide the policy reason of imposing "costs on the party most capable of pursuing legal remedies and future contracts," no actual finding is made as to the viability, extent or resolution of any such legal or contractual activity. Therefore, we hold that the PUC's decision violates the longstanding rule in *Aizen* prohibiting the disallowance of utility costs based exclusively on a policy choice.

Accordingly, we remand this portion of the decision for findings of fact as to the right and degree of control PECO exercised over Westinghouse. Based on these factual findings and in light of valid policy considerations, the PUC may then reach a legal conclusion as to whether the replacement power costs associated with the 1984 Salem I outage are permissibly allotted to PECO or the ratepayers.[10]

## 1983 AND 1984 PEACH BOTTOM OUTAGES

At issue here is a 1983, seven-day extension of an outage at Peach Bottom 3 which resulted in a disallowance of $2,023,700 in replacement power costs and a 1984, 40-hour outage extension at Peach Bottom 2 which caused a disallowance of $542,750. Each of these disallowances was based on the PUC's determination

---

[10] PECO was granted leave by this Court's order dated May 19, 1987, to file a supplemental brief addressing two recent PUC decisions which reached results contrary to its decision here on the imputation issue. The PUC and OCA were likewise permitted to submit reply briefs.

PECO contends that these two previously unavailable decisions, *Pennsylvania Public Utility Commission v. Duquesne Light Co.,* Docket No. R-860378 (March 5, 1987), *aff'd on reconsideration,* and *Pennsylvania Public Utility Commission v. Philadelphia Electric Co.,* Docket No. R-850152 (June 26, 1986), support its position that a utility should not be held accountable for manufacturing defects or contractor error absent a finding that it imprudently selected or supervised the contractor's activities. PECO also contends that these decisions demonstrate the danger of a case-by-case policy approach to this issue. The PUC and OCA respond that these cases are factually dissimilar and therefore do not control the instant matter.

We note, however, that PUC decisions are not binding on this Court. Moreover, inasmuch as the issue here is a question of first impression before this Court, we expect that our decision here will serve as precedent for these later PUC decisions should they come before us.

that PECO, as the operator of Peach Bottom, had acted imprudently.

The record testimony reveals that a condition known as intergranular stress corrosion cracking (IGSCC)[11] was found at several weld locations in piping at Peach Bottom 3. After several discussions with NRC staff, PECO structurally reinforced the designated welds. The NRC, nevertheless, delayed restart authorization for several weeks, seven days of which the PUC attributed to PECO's unreasonable expectation that the NRC would act promptly and favorably upon these welds. The PUC cited PECO's failure to submit timely a necessary affidavit to NRC in addition to its previous mischaracterization of a "through-wall" crack to support its imprudence finding. PECO reported it as a 40-percent crack when in fact it was a 100-percent crack.

The record detailing the 1984 Peach Bottom 2 outage disclosed that certain rubber seal gaskets within fuel pool gates were discovered to be leaking during a scheduled outage, resulting in an outage extension of one day and sixteen hours for repairs. PECO alleges that the inspection of the fuel pool gates was scheduled at the earliest point in the outage considering potential delay in other scheduled activities and, further, that this problem was unforeseeable. The PUC found, however, that this problem should have been anticipated due to a similar problem at Peach Bottom 3.

PECO contends that in both these determinations, the PUC has employed impermissible hindsight and result-oriented analyses and thereby misapplied the prudence standard. We agree.

---

[11] IGSCC was described by the PUC as "a generic problem in boiling water reactors (BWR) which refers to small cracks occurring along the 'grain boundaries' of BWR pipe metal in the 'heat affected zone' adjacent to piping welds in the cooling and recirculation systems." PUC opinion, pp. 75-76.

Initially, we emphasize our concern that the "high degree of care" standard enunciated at the outset of the PUC's opinion, and rejected here, tainted its analysis throughout. Furthermore, concerning the 1983 Peach Bottom 3 outage, our review of the record convinces us that the PUC engaged in improper second-guessing as to the testing methods PECO used in its pipe inspection program. It is apparent from the PUC's opinion that its imprudence finding was based primarily on the NRC's actions and the evaluation of these actions by the independent consulting firm retained by trial staff. While we acknowledge the difficulty of discounting the NRC's ultimate disposition of PECO's instant restart request, we believe, nevertheless, that the PUC has failed to limit its consideration of PECO's decisions to what PECO knew or should have known with regard to NRC restart requirements *at the time these decisions were made*. In retrospect, it is clear that PECO would have acted more prudently in completing the extensive testing and repair work ultimately required by the NRC, as well as to ensure the timely submission of the manufacturer's affidavit. However, based on the multiple competing considerations faced by PECO relating to minimizing the length of the outage while at the same time satisfying NRC's evolving demands,[12] we find that the

---

[12] PECO's witnesses consistently testified that a testing method known as fracture mechanics analysis, previously accepted by the NRC, had been applied to the piping by independent inspection teams prior to its restart request. Therefore, it contends that its request was reasonable.

Further, PECO's witnesses testified that its failure to submit a manufacturer's affidavit at the time of its restart request was due to the NRC's practice of rendering a decision based on an assurance that such documentation would later be submitted for formal docketing. The PUC, in fact, found this to be the case (PUC opinion, p. 114) but found the delay to be imprudent despite evidence that PECO had requested the affidavit two or three weeks before the submittal date.

PUC's conclusion of imprudence is the result of improper result-oriented analysis. Therefore, we vacate and remand for reconsideration of the evidence as the prudence standard restated herein applies. We again admonish the PUC to constrain its findings to those facts known to PECO at the times in question.

Similarly, while the disallowance of replacement fuel costs resulting from the 1984 Peach Bottom 2 outage extension does not appear to be facially invalid, we vacate and remand this portion of the order based on our previously enunciated concerns as to the 1983 Peach Bottom 3 outage extension.

### Eddystone I Outage

PECO lastly contests an alleged computational mistake resulting in a disallowance of $967,648 related to an Eddystone I outage. The PUC responds that because of the huge sums involved and the complexity of the issues, such an error is *de minimis*. While we recognize that mathematical precision is not required in setting rates, *Park Towne v. Pennsylvania Public Utility Commission*, 61 Pa. Commonwealth Ct. 285, 433 A.2d 610 (1981), we hold that the instant mathematical error is not so small as to be considered *de minimis* and can be easily remedied upon remand. Accordingly, we reverse and remand to the PUC for the proper calculation of this amount.

### Order

The consolidated order of the Public Utility Commission, dated October 30, 1985, at Nos. P-830453, M-840375 and M-FACE8408, is reversed in part and vacated in part. The case is remanded to the Commission for further proceedings consistent with this opinion.

Jurisdiction relinquished.

Judge Colins dissents.

Judge PALLADINO did not participate in the decision in this. case.

———

CONCURRING AND DISSENTING OPINION BY JUDGE BARRY:
I agree with all of the majority opinion except for that portion discussing the 1983 Salem 1 outage. Hence, this separate opinion dissenting from that part of the majority's resolution of the case.

As the majority notes, we are concerned with the prudence of PECO with regard to the operation of the Salem 1 power plant. The majority recognizes that the Nuclear Regulatory Commission is empowered to police nuclear facilities to protect, *inter alia,* the public's health, safety and welfare. While performing this mandated function with regard to the Salem 1 outage, the NRC found that the outage was the result of PECO's *inadequate maintenance and supervisory practices.* Despite this finding of the NRC, which finding PECO did not appeal, the majority concludes, citing a "heightened standard of care" applicable to NRC proceedings, that PECO may, nevertheless, have acted prudently and, thus, may be entitled to recover energy replacement costs. I cannot agree.

The majority recognizes that nuclear power plants pose risks to the public that are much greater than the risks associated with non-nuclear power plants. Therefore, one cannot conclude that a public utility acted prudently in the face of an express finding that the utility was guilty of inadequate maintenance and supervisory practices.

The PUC did state in this case that "[t]his degree of care is closely akin to the highest degree of care as generally understood to apply in certain areas of negligence law." PUC opinion, p. 16. From this, the majority believes the PUC is applying a standard approaching strict liability. I believe the PUC's choice of language

here was unfortunate. I can conceive of situations where a nuclear plant is shut down through no fault of the utility, even when applying the strict standards adopted by the NRC. In that case, the public utility would be entitled to recover energy replacement costs. Where the public utility does not meet the NRC's standard of care, however, the recovery of such costs cannot be allowed.

I respectfully dissent to that portion of the majority's opinion dealing with the Salem 1 outage.