COMMONWEALTH ELECTRIC COMPANY *vs.* DEPARTMENT OF
PUBLIC UTILITIES.

Suffolk. October 10, 1985. — April 22, 1986.

Present: HENNESSEY, C.J., WILKINS, LIACOS, LYNCH, & O'CONNOR, JJ.

*Public Utilities,* Fuel charges, Electric company, Judicial review. *Electric Company. Department of Public Utilities. Due Process of Law,* Public utilities. *Constitutional Law,* Federal preemption, Interstate commerce. *Administrative Law,* Agency's authority, Findings, Judicial review.

The Department of Public Utilities did not err in determining, based upon provisions in a life-of-the-unit contract between a certain electric company and the operator of the Pilgrim 1 nuclear power station, that the electric company shared the obligations and responsibilities of a joint owner of the station, at least to the extent that the department could properly impute to the company a share of the liability for replacement power costs incurred as a result of imprudence by the station operator during a period when the station was out of service, thus precluding the company from recovering these costs from the ratepayers. [364-369]

General Laws c. 164, § 94G, empowered the Department of Public Utilities to impute to an electric company the imprudent conduct of the operator of a nuclear power station with which the company had a contract for the purchase of wholesale electric power, with the result that the company was precluded from recovering from its ratepayers the replacement power costs it incurred during a time when the nuclear power station was out of service. [369-375]

The Department of Public Utilities, in inquiring into the prudence of a retail electric company in selecting its source of wholesale electric power and in imputing to the company certain imprudent conduct of one of its suppliers with which it had a contract for the purchase of wholesale electricity at rates subject to approval by the Federal Energy Regulatory Commission, did not interfere with the realization of the purposes and objectives of Congress in passing the Federal Power Act, 16 U.S.C. §§ 791a-828c (1982), and thus the department's statutory authority under G. L. c. 164, § 94G, was not preempted by Federal law. [375-379] LYNCH, J., dissenting.

The action of the Department of Public Utilities in imputing to an electric company the imprudent conduct of the operator of a nuclear power station with which the company had a contract for the purchase of whole-

sale electric power, thereby precluding the company from recovering certain replacement power costs from its retail customers, did not involve any issue which should have been raised in proceedings before the Federal Energy Regulatory Commission and thus was not an impermissible collateral attack on the wholesale rates approved by the Federal agency. [379-380] LYNCH, J., dissenting.

In a proceeding for review of an order of the Department of Public Utilities an electric company made no showing that the commerce clause of the United States Constitution had been violated by the department's action imputing to the company certain imprudent conduct by the operator of a nuclear power station with which the company had a contract for the purchase of wholesale electric power at rates approved by the Federal Energy Regulatory Commission. [380-381]

In a proceeding by an electric company challenging the action of the Department of Public Utilities in imputing to the company certain imprudent conduct by the operator of a nuclear power station with which the company had a contract for the purchase of wholesale electric power, thus precluding the company from recovering replacement power costs from its ratepayers, the company made no showing that it had been deprived of any property interest without due process of law. [381]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on October 8, 1982.

The case was reported by *Lynch, J.*

*Sander A. Rikleen (Eric J. Krathwohl* with him) for the plaintiff.

*Thomas A. Barnico,* Assistant Attorney General, for the defendant.

*Paul K. Connolly, Jr., Adrienne M. Markham & John F. Finston,* for Fitchburg Gas and Electric Light Company, amicus curiae, submitted a brief.

*Thomas G. Robinson* for Massachusetts Electric Company, amicus curiae, submitted a brief.

LIACOS, J. The Pilgrim Unit 1 nuclear power station (Pilgrim 1) was out of service for several months in 1981 and 1982. The Department of Public Utilities (DPU) issued a series of orders in which it found that the operator of Pilgrim 1, Boston Edison Company (Boston Edison), acted imprudently in certain aspects of the outage. We affirmed those orders. *Boston Edison Co.* v. *Department of Pub. Utils.,* 393 Mass. 244 (1984). Before

us now are appeals from a series of DPU orders imputing the imprudence of Boston Edison to the petitioner, Commonwealth Electric Company (company), thus precluding the company from recovering from its ratepayers certain purchased power costs attributable to that imprudence, and requiring the company to refund, with interest, the portion of those costs previously allowed. The company argues that, as matter of law, the DPU could not impute the imprudence of Boston Edison to the company, that the DPU acted beyond its statutory authority, and that regulation of its purchased power costs has been preempted by the Federal government. We affirm the orders.

We state the factual background of these proceedings. The company is a retail electric utility company distributing electricity to consumers in forty communities in southeastern Massachusetts. The company owns and utilizes its own generating facilities to meet a portion of its customers' needs, but most of the electricity it sells is purchased at wholesale from other utility companies. On August 1, 1972, the company entered into an agreement with Boston Edison to purchase 11% of the capacity of Pilgrim 1. The agreement was filed with the Federal Power Commission (FPC) and was accepted by the FPC pursuant to § 205(d) of the Federal Power Act, 16 U.S.C. § 824(d) (1982) (FPC docket no. E-8138). The agreement was in effect during 1981 and 1982. The Pilgrim 1 outage made it necessary for the company to obtain replacement power for its customers at a cost greater than the cost of power the company normally would have obtained from Pilgrim 1.

On June 3, 1982, the company notified the DPU that it intended to apply for approval of a change in the allowed fuel charge in its next quarterly filing under G. L. c. 164, § 94G (*b*) (1984 ed.). The DPU issued a procedural order, D.P.U. 1003-G-1, which stated that the DPU intended to determine the company's liability for replacement power costs incurred as a result of Boston Edison's imprudence in the Pilgrim 1 outage. A series of hearings on this issue ensued. In the interim, the DPU authorized a quarterly fuel adjustment charge subject to refund, with interest, pending the outcome of the proceedings. D.P.U. 1003-G-2.

On September 22, 1982, the DPU issued its order. D.P.U. 1003-G-6. Among the DPU's findings was the following: "The Department finds that the Company shares responsibility for BECo's [Boston Edison's] imprudence during the Pilgrim 1 outage. Pursuant to its life-of-the-unit contract, ComElectric was not relieved of its service responsibilities, which include providing electricity at the lowest possible fuel cost; therefore, we believe that the Company is imputedly liable under G. L. c. 164, § 94G, for BECo's imprudence and that under that statute the Company's ratepayers should not pay the costs associated with the imprudent practices during the Pilgrim 1 outage." D.P.U. 1003-G-6, at 17-18. The DPU found the additional costs incurred by the company in the periods during which Boston Edison was imprudent to be $552,513. *Id.* at 21. The DPU ordered the company to return that amount, with interest of $43,450, to the ratepayers through a reduction in the fuel charge for October through December, 1982. D.P.U. 1003-H.

The company appealed from the orders of the DPU, under the authority granted in G. L. c. 25, § 5 (1984 ed.). A single justice reserved and reported the appeal.

The company makes essentially three claims of error: (1) The DPU legally could not impute to the company the imprudence of Boston Edison; (2) the DPU could not issue its orders without exceeding its authority under the provisions of G. L. c. 164, § 94G (1984 ed.); and (3) the DPU could not exercise regulatory authority over the relationship between the company and its wholesale suppliers of power because the Federal government has preempted that authority.

1. *Imputation of imprudence.* The DPU determined that the company shared the responsibilities and obligations of a joint owner of the Pilgrim 1 unit. This finding was based on the provisions of the contract between the company and Boston Edison.

The company claims that it is in fact not an owner of the Pilgrim 1 unit. We do not read the decision of the DPU to be to the contrary. The DPU found that the company "does not have an ownership share in the Pilgrim 1 unit, [but that] its life-

of-the-unit contract is in all relevant respects here the same as partial ownership." The company contends, however, that the DPU erred in interpreting the company's contract with Boston Edison so as to find it "in all relevant respects here the same as partial ownership."

The DPU's interpretation was based on five sections of the contract set forth in the margin.[1] Pointing out the general rule that the terms and provisions of a contract are to be interpreted in the context of the entire contract, cf. *Glick* v. *Greenleaf,* 383 Mass. 290, 296 (1981); *McMahon* v. *Monarch Life Ins. Co.,* 345 Mass. 261, 264 (1962), the company draws our attention to clauses limiting the start-up risks it assumed; making Boston Edison responsible for financing, construction, licensing, staffing, operation, and maintenance of the facility; limiting the company's authority in decision making; imposing a standard of due diligence on Boston Edison; requiring Boston Edison to obtain insurance; and obligating Boston Edison to sell power to the company on terms as favorable as it granted

---

[1] Section 3.2 of the contract provides that the company has the right to consult with Boston Edison "concerning significant decisions with respect to construction or subsequent modifications of or additions to the Unit."

Section 8.1 explains the parties' intent in the event of extraordinary losses: "It is the intent of this Paragraph that Buyer [company] share with Seller [Boston Edison] any risk falling on Seller and arising pursuant to this Agreement to the extent of eleven percent (11%), and in such a manner that the risk of loss falling on Buyer is identical to such risk as would befall a complete owner of eleven percent (11%) of the Unit."

Section 9.2 is an agreement by the company to reimburse Boston Edison for 11% of the unrecovered value of the power plant in the event of a shutdown before the investment has been recovered.

In Appendix C, covering payment obligations, the parties established their intent through § C-1.1: "It is the intent of the parties that during the term of the Agreement, Buyer shall reimburse Seller during the term of this Agreement as provided herein for eleven percent (11%) of all costs incurred by Seller by virtue of: (1) the construction of, or any modifications of additions to the Unit, and (2) the operation of or maintenance to the Unit."

Appendix A, § A-3.1, detailing performance standards, sets forth the assumption of risk of nonperformance as follows: "The intent of this provision is that Buyer shall assume the risks of non-delivery of electricity hereunder caused by the hazards of the business to the same extent as if it were itself operating the Seller's Unit for the purpose of supplying itself with electricity . . . ."

to any buyer. These provisions were not mentioned in the DPU decisions.

Assuming that the contract provisions shifting responsibility and risk to Boston Edison are indicators of Boston Edison's predominant ownership role, we do not agree, as the company argues, that the DPU erred in finding enough indicators of the company's responsibilities and obligations to justify the conclusion that the company's role is the same as partial ownership for the purposes of the instant inquiry.[2]

The DPU rested its decision on the imputed imprudence of Boston Edison and did not reach the question of the company's own imprudence. The company argues that it cannot be held responsible for Boston Edison's acts, absent proof of its control over Boston Edison.[3]

---

[2] We do not conclude that actual or constructive ownership is a prerequisite to imputation of imprudence to a public utility. The analysis of the DPU includes the finding that the contract created the obligations and privileges of a joint owner. D.P.U. 1003-G-6, at 17. It is not the company's similarity to an owner that is dispositive, however, but its nondelegable statutory obligations. Therefore, although we have in the past construed the term "owner" broadly to effectuate the legislative purpose, see *Coyle* v. *Swanson,* 345 Mass. 126 (1962), and found that its meaning is flexible, see *Northgate Constr. Co.* v. *State Tax Comm'n,* 377 Mass. 205, 208 (1979); *Animal Rescue League* v. *Assessors of Bourne,* 310 Mass. 330, 333 (1941), there is no need to analyze today what attributes a public utility must possess to be considered an "owner" by the DPU.

[3] In support of its argument, the company cites decisions of administrative law judges of the Federal Energy Regulatory Commission (FERC), decisions of Federal courts that examined Environmental Protection Agency (EPA) regulations imposing vicarious liability, and general principles of tort and agency law.

The DPU distinguishes the FERC administrative decisions, arguing that the statutory authority of the FERC differs from that of the DPU. Though perhaps persuasive authority by analogy, decisions of a foreign administrative agency do not control Massachusetts law. Cf. *Bonitz* v. *Travelers Ins. Co.,* 374 Mass. 327, 329-330 (1978); *Dexter* v. *State Tax Comm'n,* 350 Mass. 380, 382-383 (1966). Similarly, a decision based on EPA's lack of statutory authority to impose vicarious liability does not control our consideration of the DPU's imputation of imprudence. Cf. *Commonwealth* v. *Masskow,* 362 Mass. 662, 667 (1972); *Commonwealth* v. *LePage,* 352 Mass. 403, 409 (1967); *Dexter* v. *State Tax Comm'n, supra.*

In our view, it is the dissenting opinion of Wright, J., in the cited case *Amoco Oil Co.* v. *EPA,* 543 F.2d 270, 279-284 (D.C. Cir. 1976), that is

The company relies most heavily on general principles of tort and agency law that tie vicarious liability to the right to control, citing *Caron* v. *Lynn Sand & Stone Co.,* 270 Mass. 340, 346 (1930) (joint enterprise), *Khoury* v. *Edison Elec. Illuminating Co.,* 265 Mass. 236, 238 (1928) (right to control determines master-servant relationship and thus whether respondeat superior applies), and *Trent* v. *Atlantic City Elec. Co.,* 334 F.2d 847, 858-859, 864 (3d Cir. 1964) (applying New Jersey law). The company asserts that, while a joint venturer may be found imputedly liable for the acts of his coventurer, *Caron* v. *Lynn Sand & Stone Co., supra,* he must have an equal right to direct or control the coventurer, *Caron, supra* at 346, and an intent to be a joint venturer, *Cardullo* v. *Landau,* 329 Mass. 5, 8 (1952). The company claims that it "clearly does not have control over" Boston Edison and that it does not "even share control over construction, operation or maintenance of the Pilgrim 1 Plant." Since the company did not have an equal right of control, and no intent to be a joint venturer was shown in the record, the company claims that it cannot be imputedly liable as a joint venturer.

In our view, reliance on tort analogies to define a public utility's responsibility in a regulated area of rate and fuel costs is unpersuasive. We find ample justification for the DPU's decision in the policy manifested by the statutory scheme of public utility regulation. The DPU was warranted in finding that the provisions of the contract reveal the company's intent

---

illuminating for this case. Judge Wright notes that "[v]icarious liability — like other forms of strict liability — is imposed not because there is 'compelling evidence of control,' but rather because some properly authorized agency of government — court, legislature, or administrative body — has determined that such an allocation of responsibility will serve society's ends. The determination may rest on the judgment that it is more just to impose liability on the party who entered the business knowing of the general hazards, rather than risk leaving the entire loss on the innocent injured party" (footnote omitted). *Id.* at 281. As between the stockholders and the ratepayers of the company, it is the stockholders who are more aware of the general hazards of the business, and the ratepayers who are the more innocent parties.

to be treated as a joint owner and impose the kinds of risks and obligations ordinarily associated with ownership. See note 1, *supra*. The DPU relied on policy rationales supporting the imputation of imprudence to the company. "[T]here should be uniform treatment of companies involved in the same project, and . . . allowing the form of the contract to control a company's responsibility for providing service at the lowest possible cost would create an untoward incentive for utilities to establish ownership forms that exempt them from liability." D.P.U. 1003-G-6, at 18 n.1. "[T]his statute [G. L. c. 164, § 94G] was intended to operate consistently for all electric utilities the Department regulates . . . ." *Id.* at 20. Such a statement of policy imperatives is wholly within the DPU's responsibility in administering the statutory regulatory scheme. *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 394 Mass. 671, 680 (1985) (*Fitchburg II*). See G. L. c. 164, § 76 (1984 ed.).

The utility and its shareholders are protected from the risks associated with competition.[4] The shareholders are protected, however, only from risks normally due to competition, not from all risks. They must, just as must shareholders of a competitive private corporation, accept the risks of the company's failure. Failure could be due to the negligence or incompetence or simply unfortunate decisions of the company's directors,[5] to the imprudence of its contractors, or to conditions entirely external, such as the oil shortages of the last decade. The shareholders cannot automatically shift those risks to the ratepayers. The ratepayers are not the guarantors of the company's success.

---

[4] In return for its shelter from the uncertainties of the competitive market place, the public utility assumes the responsibility to provide adequate service at reasonable rates. See *Fitchburg II, supra,* and authorities cited therein. This duty is imposed by statute and, though its performance may be delegated, the duty may not.

[5] The ratepayers should not bear the loss where the business judgment of the company's directors is inconsistent with valid policies of the DPU. *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 375 Mass. 571, 578-579 (1978) (*Fitchburg I*).

We discuss policy recognizing that "questions of policy are for [the] administrative agency." *Attorney Gen.* v. *Department of Pub. Utils.,* 390 Mass. 208, 228 (1983). There are other policy considerations involved. Imputation of imprudence encourages vigilant oversight by those who have delegated their responsibilities. The DPU stands as the agency charged with the responsibility for protecting the interests of the ratepayers. We note that the DPU's role in guarding the ratepayers' interests and assuring that utility companies are not encouraged to avoid their responsibilities is supported by long-standing decisions in which we have found the legislative purpose to be protection of ratepayers. See *Boston* v. *Edison Elec. Illuminating Co.,* 242 Mass. 305, 309 (1922). "[T]he function of the [DPU] is the protection of public interests and not the promotion of private interests." *Lowell Gas Light Co.* v. *Department of Pub. Utils.,* 319 Mass. 46, 52 (1946). It is the goal of the statutes and regulations "to ensure to the public the availability of service at reasonable cost from private industry protected from the risk of competition." *Attorney Gen.* v. *Department of Pub. Utils., supra* at 235 (Liacos, J., dissenting).

2. *Statutory authority.* The company argues that the relevant legislative grant of authority to the DPU, G. L. c. 164, § 94G, does not authorize the DPU to act as it has in this case. In particular, the company says that under § 94G (*a*) the DPU (1) cannot disallow costs based on vicarious liability; (2) must make a "finding" of imprudent conduct by the company before disallowing costs; and (3) cannot disallow costs of purchased power. The DPU responds that the plain language of the statute, the legislative purpose and policy, and application of principles of statutory construction demonstrate that the DPU has the authority to disallow costs of purchased power due to the company's imputed imprudence.

It is our task to interpret the statute. *Casey* v. *Massachusetts Elec. Co.,* 392 Mass. 876, 879 (1984). *Cleary* v. *Cardullo's, Inc.,* 347 Mass. 337, 334 (1964). An examination of the statute[6]

---

[6] General Laws c. 164, § 94G (*a*) (1984 ed.) provides, in pertinent part: "At least once a year, on dates set by the department, each electric company

reveals that § 94G (*a*) sets forth the procedure for approval and review of an electric company's annual proposed performance program. The performance program was intended to stimulate planning by the utilities to achieve the "most efficient and economical use of fuel" in the face of the dramatic increases in the price of oil shortly before the legislation was enacted. See Message of the Governor, 1981 House Doc. No. 5012. Section 94G (*b*) governs the approval and adjustment of the fuel charge. The statute forces planning by utility companies seeking approval of a fuel charge through mandatory participation in the energy conservation performance program described in § 94G (*a*). Also linking the two provisions is DPU review under § 94G (*a*) of a company's success in meeting its performance program goals.

If the company's performance varies from its approved performance targets, the DPU may order the company to explain the variance at its next fuel charge hearing under § 94G (*b*). "In the course of such hearing, the department shall investigate such variance, may otherwise inquire into an issue related to the procurement or use of fuel or purchased power included in the fuel charge and properly raised by any party, and, in either event, shall make a finding whether the company failed to make all reasonable or prudent efforts consistent with accepted management practices, safety and reliability of electric service and reasonable regional power exchange requirements to achieve the lowest possible overall costs to the customers

having a fuel charge approved by the department shall file with the department and simultaneously with the attorney general a proposed performance program relating to fuel procurement and use. Such program shall describe for the time period or periods designated reasonably attainable targets which shall include a thermal efficiency target for the performance of the company . . . . Each such electric company shall file with the department, with the frequency and in the standardized form established by the department, data and reports on the actual unit by unit and system performance of the company with respect to each target set forth in the approved performance program. If any such periodic report indicates that actual system performance varied from the approved targets, upon order by the department or petition of any party to the proceeding the company shall, at the next following fuel charge hearing under subsection (*b*), present evidence explaining such variance."

of the company for the procurement and use of fuel and pur-
chased power included in the fuel charge." G. L. c. 164, § 94G
(*a*), lines 63-72.

The company, though it had received DPU approval for a
fuel charge, had no approved § 94G (*a*) performance program
in place during the relevant time periods. The DPU justified
its application of § 94G (*a*), nevertheless, under § 7 of the
Fuel Charge Act, St. 1981, c. 375. That section provides:
"Any fuel charges approved subsequent to the effective date
of this act and prior to the approval of the initial performance
program pursuant to subsections (*a*) and (*b*) of section ninety-
four G of chapter one hundred and sixty-four of the General
Laws, shall be subject to review and such other provisions of
said subsections (*a*) and (*b*)."[7]

The review procedure of § 94G (*a*) permits the deduction
of imprudently incurred fuel costs from the fuel charge for the
next quarter. The statute provides for this deduction in the
following sentence: "If the department finds that the company
has been unreasonable or imprudent in such performance, in
light of the facts which were known or should reasonably have
been known by the company at the time of the actions in
question, it shall deduct from the fuel charge proposed for the
next quarter or such other period as it deems proper the amount
of those fuel costs determined by the department to be directly
attributable to the unreasonable or imprudent performance."
G. L. c. 164, § 94G (*a*), lines 72-79.

The Legislature did not restrict the DPU to inquiry as to the
performance of a utility company "*except for*" the portions of
its responsibility delegated to independent contractors or others.
The statutory instructions are quite broad. The DPU is required
to determine "whether the company failed to make all reason-
able or prudent efforts consistent with accepted management
practices, safety and reliability of electric service and reason-
able regional power exchange requirements to achieve the low-
est possible overall costs to the customers of the company for

---

[7] There is no dispute as to the applicability of the statute.

the procurement and use of fuel and purchased power included in the fuel charge." G. L. c. 164, § 94G (*a*), lines 67-72. The DPU is directed to inquire into issues *related* to the fuel charge, *id.* at line 65 (in addition to those variances from the performance target that triggered the hearing). The scope of the inquiry extends to "*all* reasonable or prudent efforts consistent with accepted management practices," (emphasis added) *id.* at lines 67-68. The modifier "all" emphasizes the Legislature's intent not to restrict the DPU's investigation. It could not be maintained seriously that "accepted management practices," *id.* at line 68, do not include the subcontracting of work. Yet if the DPU can investigate only those actions taken by direct employees of the utility company, the work done by a subcontractor would be cloaked from oversight.

The goal of the investigation is clearly spelled out in the statute and is reflected in our consistent and long-standing interpretation of the State's role in regulating public utilities, see *Lowell Gas Light Co.* v. *Department of Pub. Utils., supra*; *Boston* v. *Edison Elec. Illuminating Co., supra,* in that the statute charges the DPU to assure that the utility acts "to achieve the lowest possible overall costs to the customers of the company." G. L. c. 164, § 94G (*a*), lines 70-71. Restricting the inquiry to exclude performance responsibilities delegated to subcontractors clearly would not further that goal.

The company cites two cases, *West Ohio Gas Co.* v. *Public Utils. Comm'n,* 294 U.S. 63 (1935), and *Minnesota Power & Light Co.,* 11 F.E.R.C. par. 61,313 (1981),[8] to support

---

[8] Minnesota Power & Light Co. (MP&L) contracted with a pollution control company controlled by one of MP&L's directors. When the equipment installed by the contractor did not perform properly, it was abandoned, and MP&L sought approval to pass the consequent loss on to its ratepayers. The approval was denied because "MP&L acted imprudently in the entire matter." 11 F.E.R.C. par. 61,313, at 61,659 (1981), quoting decision of the administrative law judge. The *Minnesota Power* case does not appear to lend support to the company's argument. As we read the decision of FERC, MP&L was found imprudent due to "self-dealing, the selection of a questionable pollution control process, and the failure either (or both) to secure a performance guarantee and to seek damages." 11 F.E.R.C. par. 61,313, at 61,659 (1981).

its contention that the statute does not permit imputation of imprudence.[9] In *West Ohio Gas Co.,* the Supreme Court of the United States found a due process violation in the Ohio Public Utilities Commission's denial of the gas company's claim for an allowance of 9% of gas lost as a result of leakage, condensation, expansion, or contraction. There was no dispute that a certain loss due to these causes was unavoidable no matter how carefully the business was conducted. *Id.* at 67. The Commission had granted only a 7% allowance based on its unproved assertion that any greater loss was wasteful and negligent. 294 U.S. at 68. The Supreme Court held that "[t]he waste or negligence . . . must be established by evidence of one kind or another, either direct or circumstantial." *Id.* We do not believe that *West Ohio* applies here, as the imprudence of Boston Edison was based on substantial evidence, D.P.U. 1009-F, and affirmed on judicial review, *Boston Edison Co. v. Department of Pub. Utils.,* 393 Mass. 244 (1984), and the company was offered an opportunity to participate directly in additional hearings on the issue. D.P.U. 1003-G-3. *West Ohio* does not reach the issue whether the imprudence of Boston Edison properly can be imputed to the company in light of its own statutory responsibilites and contractual arrangements with Boston Edison.

The company makes the argument that the process required by the Legislature includes a formal "finding" by the DPU. It relies on the following language: "[T]he department . . . *shall make a finding* whether the company failed to make all reasonable or prudent efforts consistent with accepted management practices, safety and reliability of electric service and reasonable regional power exchange requirements to achieve the lowest possible overall costs to the customers of the company" (emphasis added). G. L. c. 164, § 94G (*a*), lines 63-71. Such

---

[9] We are not bound, of course, in our interpretation of Massachusetts law, by decisions of other tribunals, except by decisions of the Supreme Court of the United States relying on the Federal Constitution. *Commonwealth* v. *Montanez,* 388 Mass. 603, 604 (1983).

a finding was made. D.P.U. 1003-G-6, at 17. ("The Department finds that the Company shares responsibility for BECo's imprudence during the Pilgrim 1 outage").

The company argues from the text of the statute that the Legislature distinguished "fuel costs" from "costs of purchased power." The statute authorizes inquiry into "the procurement or use of fuel or purchased power included in the fuel charge," G. L. c. 164, § 94G (*a*), lines 65-66 & 71-72, and requires a finding on the utility company's performance in achieving "the lowest possible overall costs . . . for the procurement and use of fuel and purchased power included in the fuel charge," *id*. at lines 70-72, but provides for deduction from the upcoming fuel charge only "the amount of those fuel costs determined by the department to be directly attributable to the unreasonable or imprudent performance." *Id*. at lines 77-79.

The company contends that this distinction is a manifestation of the purpose of the Legislature. By parsing the two elements of the fuel charge, the company urges, the Legislature avoided the preemption question, see *infra,* and focused the enforcement mechanism of the fuel conservation section of the statute on the power-generation performance of the utility, where conservation measures could be effective.

We do not agree that the distinction pressed by the company is meaningful. The Legislature specifically directed the DPU to inquire into, and make a finding on, the prudence of the company's actions in purchasing power. Were we to accept the company's interpretation, the Legislature's direction to the DPU would require a hollow exercise of administrative power for no tangible purpose. Such an interpretation would be "at odds with a workable reading of the entire statute." *American Family Life Assurance Co*. v. *Commissioner of Ins., 388* Mass. 468, 473, cert. denied, 464 U.S. 850 (1983). The DPU is repeatedly charged to act on matters connected to fuel charges by language linking costs of fuel and purchased power. The statute is aimed at achieving "the lowest possible *overall* costs . . . for the procurement and use of fuel and purchased power" (emphasis added). G. L. c. 164, § 94G (*a*), lines 70-71. If only costs of fuel used for the company's own generating units

were subject to DPU regulation, the requirements covering purchased power would be meaningless. "None of the words of a statute is to be regarded as superfluous, but each is to be given its ordinary meaning without overemphasizing its effect upon the other terms appearing in the statute, so that the enactment considered as a whole shall constitute a consistent and harmonious statutory provision capable of effectuating the presumed intention of the Legislature." *Bolster* v. *Commissioner of Corps. & Taxation,* 319 Mass. 81, 84-85 (1946).

We do not believe that it was the Legislature's intent to require the DPU to pursue investigation, inquiry, and oversight of costs of purchased power, yet deny any meaningful conclusion to that investigation. We reject the company's interpretation and find that the "fuel costs" that may be deducted from the "fuel charge proposed" are the same costs that the Legislature has specified throughout the statute as comprising the "fuel charge," that is, the "costs of fuel to be used in generating or supplying electricity to customers and power purchased for resale to customers." G. L. c. 164, § 94G (*b*), lines 106-108.

3. *Preemption.* The company contends that the DPU has been preempted of jurisdiction to disallow the costs at issue here by the Federal Constitution and Federal statute, and thus that its actions are invalid under the supremacy clause of the United States Constitution. Art. VI, cl. 2. The Supreme Court of the United States has observed that "state law can be preempted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted. . . . If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, . . . or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." (Citations omitted.) *Silkwood* v. *Kerr-McGee Corp.,* 464 U.S. 238, 248 (1984).

In considering a preemption argument, we note that preemption "is not favored, and State laws should be upheld unless a conflict with Federal law is clear." *Attorney Gen.* v. *Travelers*

*Ins. Co.*, 385 Mass. 598, 602 (1982), vacated 463 U.S. 1221 (1983), reaffirmed, 391 Mass. 730 (1984), aff'd sub nom. *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U.S. 724 (1985). See *Exxon Corp.* v. *Governor of Md.*, 437 U.S. 117, 132 (1978); *Commonwealth* v. *McHugh*, 326 Mass. 249, 265-266 (1950). The burden is on the party seeking to displace the State action to show preemption with hard evidence of conflict based on the record. *Arthur D. Little, Inc.* v. *Commissioner of Health & Hosps. of Cambridge*, 395 Mass. 535, 545 (1985).

Commonwealth Electric does not contend that Congress has chosen to occupy the field of regulation of electricity sales. Indeed, it could not, as Congress clearly limited the Federal role to regulation of sales of electricity at wholesale, and left regulation of sales at retail to the States. *Batavia* v. *FERC*, 672 F.2d 64, 68 n.2 (D.C. Cir. 1982). See *FPC* v. *Southern Cal. Edison Co.*, 376 U.S. 205, 215-216 (1964). Commonwealth Electric might have attempted to show an "actual conflict" in State and Federal regulation due to the physical impossibility of compliance with both State and Federal direction, *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U.S. 132, 142-143 (1963). It did not do so. Its preemption argument thus is based on the contention that the action of the DPU is an obstacle to the realization of the purposes and objectives of Congress in passing the Federal law. See *Silkwood, supra.*

The Federal law involved in this case is the Federal Power Act (FPA).[10] The Supreme Court of the United States discussed the history of the FPA in *Arkansas Elec. Coop.* v. *Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377-380 (1983), and explained that the purpose of the FPA was to fill the regulatory gap left by the Court's decision in *Public Utils. Comm'n of R.I.* v. *Attleboro Steam & Elec. Co.*, 273 U.S. 83 (1927). *Arkansas Elec. Coop., supra* at 384. See *Jersey Cent. Power & Light Co.* v. *FPC*, 319 U.S. 61, 67-68 & n.7 (1943). As the

---

[10] Act of June 10, 1920, c. 285, as amended by Title 11 of the Public Utility Act of 1935, 49 Stat. 803, and subsequent amendments (codified at 16 U.S.C. §§ 791a-828c [1982]).

United States Supreme Court has pointed out, Congress was addressing the mischief it perceived latent in the unregulated utility industry when it passed the FPA. "The Act had two primary and related purposes: to curb abusive practices of public utility companies by bringing them under effective control, and to provide effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce. 49 Stat. 803-804, 847-848; S. Rep. No. 621, 74th Cong., 1st Sess. 1-4, 17-20; H. R. Rep. No. 1318, 74th Cong., 1st Sess., 3, 7-8; *Jersey Central Co.* v. *FPC,* 319 U.S. 61, 67-68 (1943); see *North American Co.* v. *SEC,* 327 U.S. 686 (1946). The Act was passed in the context of, and in response to, great concentrations of economic and even political power vested in power trusts, and the absence of antitrust enforcement to restrain the growth and practices of public utility holding companies. See S. Rep. No. 621, *supra,* at 11-12; Utility Corporations — Summary Report, 70th Cong., 1st Sess., S. Doc. No. 92, Part 73-A, pp. 47-54; 79 Cong. Rec. 8392 (1935). In order to achieve federal regulation of these and other perceived problems on the operational level of the interstate public utility business, Tit. 11 was enacted. S. Rep. No. 621, *supra,* at 17; H. R. Rep. No. 1318, *supra,* at 7." *Gulf States Utils. Co.* v. *FPC,* 411 U.S. 747, 758 (1973).

Commonwealth Electric argues that because the rates it must pay to its wholesale suppliers are fixed by FERC regulation, oversight by the DPU of the company's costs based on those rates is an obstacle to the realization of the purposes behind the FPA. The company cites our decision in *Eastern Edison Co.* v. *Department of Pub. Utils.,* 388 Mass. 292 (1983), for the proposition that the DPU has no jurisdiction over expenses incurred under an FERC-approved rate.

The company has construed too broadly both the scope of DPU's oversight of rates and our holding in *Eastern Edison.*[11]

---

[11] Eastern Edison Company (Eastern Edison) purchased power from its wholesale supplier, also its wholly-owned subsidiary, Montaup Electric Company (Montaup). Montaup increased its wholesale rate in order to recoup its investment in the abandoned Pilgrim Nuclear Unit No. 2 project. The wholesale rate was regulated exclusively by FERC. Eastern Edison,

The DPU argues that the Federal regulation of the rates for wholesale transactions is not disturbed by its inquiry into the prudence of a retail seller in choosing the source of its supply and in incurring particular costs. We agree.

The DPU offers a telling analogy to the rates it approves for retail sales to clarify the difference between rate-approval and inquiry into the prudence of incurring costs. "[W]hen the [DPU] sets retail rates, retail customers are faced with a rate that has been found to be just and reasonable, and they must pay that rate if they choose to buy electricity. . . . Decisions to purchase electricity, however, present different questions for each buyer. An industrial customer, for example, may decide that, given available alternatives, the purchase of electricity from the retail company is not reasonable or prudent from his business' point of view. He may choose to use his own power generation equipment or another source of energy, such as oil, natural gas, or coal. He may decide to leave the geographic area altogether. Similarly, a retail electric company may decline to execute a wholesale supply contract upon the discovery of less expensive alternatives. If it chooses to ignore those alternatives and execute the wholesale contract, however, or if it incurs wholesale costs as a result of its imprudence . . . , it may be ruled imprudent notwithstanding the fact that the rate at which it purchased wholesale electricity was approved by FERC."

---

in accordance with the provisions of G. L. c. 164, § 94G, sought approval of an increase in its retail fuel adjustment charge to cover the increase in Montaup's wholesale rate. The DPU disallowed recovery of a portion of the costs, and Eastern Edison appealed. We held that the DPU could not review the reasonableness of the wholesale rate, as it was exclusively regulated by FERC. *Eastern Edison, supra* at 302. No question of imprudence was present in *Eastern Edison,* and it is not controlling here. See *Appeal of Sinclair Mach. Prods., Inc.,* 126 N.H. 822, 834-835 (1985).

The company urges that the distinction between review of rates of sale and prudence of purchase is not valid. The cited case of *Consolidated Edison Co.* v. *Public Serv. Comm'n,* 63 N.Y.2d 424 (1984), is inapposite because the State law at issue there purported to fix rates at which utilities were compelled to purchase energy produced by alternate energy producers. It is not disputed here that the approval of wholesale rates is within the Federal domain.

In short, while the DPU cannot inquire into the reasonableness of wholesale rates fixed by FERC, *Eastern Edison, supra,* the DPU may inquire whether a purchaser, such as the company, is warranted in agreeing to purchase at such a rate considering its alternatives. *Appeal of Sinclair Mach. Prods., Inc.,* 126 N.H. 822, 825 (1985).

The company has failed to sustain its burden of demonstrating by hard evidence how the action of the DPU will frustrate the full purposes and objectives of Congress in enacting the FPA. We conclude that the DPU was not preempted from the action it took in this case.

The company makes three additional related arguments: first, that the DPU is attacking collaterally (and therefore impermissibly) the FERC administrative decision to approve the company's contracts with its wholesale suppliers; second, that the DPU action is prohibited by the commerce clause of the Constitution of the United States, art. I, § 8, cl. 3; and third, that the disallowance of recovery of incurred costs constitutes a confiscation of property without due process of law. We address each of these arguments briefly.

a. *Collateral attack on an administrative decision.* The company contends that the DPU — by refusing to allow the cost recovery — is attempting to circumvent the FERC administrative procedures for rate approval and the provisions for judicial review of that approval, see 16 U.S.C. § 825l (1982), by collaterally attacking the approved rate. Cf. *Tacoma* v. *Taxpayers of Tacoma,* 357 U.S. 320, 339-341 (1958) (State could not raise in later proceeding between same parties issue that should have been raised in review of FPC [predecessor to FERC] decision); *Commonwealth of Mass., Dep't of Pub. Utils.* v. *United States,* 729 F.2d 886, 886 (1st Cir. 1984) (State cannot order utility to seek FERC approval of State-proposed change in utility's FERC-regulated rates and practices but must itself follow statutory procedure by filing complaint seeking FERC action). This argument would have merit if we were convinced that the issue is one over which FERC has jurisdiction. As stated above, we do not agree with that contention. Because FERC does not have jurisdiction over retail rates,

the issue raised here could not, and should not, have been raised in an FERC rate-approval proceeding or a review of an FERC decision. Thus, the "attack" is not precluded under the *Tacoma* rationale.

b. *The commerce clause.* The company suggests that the action of DPU violates the commerce clause of the Constitution of the United States, art. I, § 8, cl. 3. The company cites three factors demonstrating the unconstitutional burdens allegedly imposed by the DPU action: the benefit of an "added level of review of prudence of power supply costs" would not outweigh the burdens of uncertainty of the finality of FERC approval, possible disparate State-by-State treatment, and discouragement of long-term contracts.

"Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co.* v. *Detroit,* 362 U.S. 440, 443 [1960]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues, *Southern Pacific Co.* v. *Arizona,* 325 U.S. 761 [1945], but more frequently it has spoken in terms of 'direct' and 'indirect' effects and burdens. See, *e.g., Shafer* v. *Farmers Grain Co.,* [268 U.S. 189 (1925)]." *Pike* v. *Bruce Church, Inc.,* 397 U.S. 137, 142 (1970). See *Commonwealth* v. *B & W Transp. Inc.,* 388 Mass. 799, 808, appeal dismissed sub nom. *Burke Distrib. Corp.* v. *Massachusetts,* 464 U.S. 957 (1983); *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health,* 379 Mass. 70, 80-81 (1979).

The company's description of the benefit of State regulation — an "added level of review of prudence of power supply

costs" — is inaccurate. The DPU review of the prudence of retail utilities is not "added"; the DPU is the agency charged with that function, and the jurisdiction of FERC is expressly limited to exclude that function. See 16 U.S.C. §§ 824(a), (b)(1) (1982); *Batavia* v. *FERC,* 672 F.2d 64 (D.C. Cir. 1982); *FPC* v. *Southern Cal. Edison Co.,* 376 U.S. 205 (1964). The speculative burdens supposed by the company are not established in the record and certainly are not "clearly excessive." *Pike, supra.* There has been no showing that the DPU action violates the commerce clause.

c. *Confiscation without due process.* The company argues that it has been deprived of its property without due process of law.[12] As we understand it, this claim arises because, according to the company, there was "an absence of any finding of [the company's] imprudence."

In considering a due process claim, we examine first whether the claimant has been deprived of "property," and, if so, we consider what process is due. *Regents of State Colleges* v. *Roth,* 408 U.S. 564, 570-571 (1972). The company's brief does not show that it has been deprived of "property." We do not proceed any further.[13]

4. *Summary.* The Department of Public Utilities did not err in imputing to Commonwealth Electric Company the impru-

---

[12] The company's brief does not cite the constitutional provisions on which it relies for this argument. The due process argument is a section of the company's argument that the DPU action is a Federal constitutional violation, however, and we presume that the company bases its claim on the Fourteenth Amendment to the United States Constitution. We express no opinion on any due process claims which might be based on the Constitution of the Commonwealth.

[13] Even if we were to conclude that the company's opportunity to recover the costs of providing service is "property," we would have difficulty in finding that the company was due any process it did not receive. The company was permitted to participate in an extensive formal hearing to establish the facts upon which the DPU's decision was based, and presented its arguments before the decision maker. The company seems to be arguing under due process guise for a different substantive standard of decision. Their due process argument is in essence a restatement of their complaint that imprudence was improperly imputed to them. We have considered that argument above, and we have rejected it.

dence of Boston Edison Company. Nor did the DPU exceed its statutory authority granted by the Legislature. The Federal Constitution and the FPA do not prohibit the regulatory action taken by the DPU. Therefore, the relief sought by Commonwealth Electric Company is denied, and a judgment is to enter in the county court affirming the orders of the DPU.

*So ordered.*

LYNCH, J. (dissenting). The Federal Power Act extends the scope of Federal regulatory jurisdiction "to the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824 (b) (1) (1982). However, Congress did not limit jurisdiction to *sellers* at wholesale, but rather conferred jurisdiction over wholesale transactions. See, e.g., *Panhandle E. Pipe Line Co.* v. *Public Serv. Comm'n,* 332 U.S. 507, 516-518 & nn.13, 14 (1947); *Appeal of Sinclair Mach. Prods., Inc.,* 126 N.H. 822, 829 (1985).

Because Congress evidenced "an intent to occupy" the field of wholesale transactions, inquiries relating to the prudence of such transactions (whether focusing upon buyer or seller) would be preempted, *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 203-204 (1983), were it not for the fact that Congress has given FERC the power to leave areas of its jurisdiction[1] to the States. *Arkansas Elec. Coop.* v. *Arkansas Pub. Serv. Comm'n,* 461 U.S. 375, 383-385 (1983). FERC has unequivocally adopted the policy that issues of purchaser prudence are best left to the States, and has repeatedly withheld the assertion of jurisdiction over such questions. *Consolidated Gas Co. of Fla., Inc.* v.

---

[1] Of course, FERC cannot delegate its jurisdiction to regulate in violation of the Federal Power Act nor, apart from that act, can States be given the power to regulate in violation of the commerce clause's "implied limitation on the power of the States to interfere with or impose burdens on interstate commerce." *Western & S. Life Ins. Co.* v. *State Bd. of Equalization,* 451 U.S. 648, 652 (1981). See *Arkansas Elec. Coop.* v. *Arkansas Public Serv. Comm'n,* 461 U.S. 375, 389 (1983).

*Florida Gas Transmission Co.*, 28 F.E.R.C. par. 61,350 (1984). *Southern Co. Servs., Inc.* 26 F.E.R.C. par. 61,360 at 61,795 (1984). *Pennsylvania Power & Light Co.*, 23 F.E.R.C. par. 61,006 at 61,019 (1983). *Philadelphia Elec. Co.*, 15 F.E.R.C. par. 61,264 at 61,601 (1981). Compare *Eastern Edison Co.* v. *Department of Pub. Utils.*, 388 Mass. 292 (1983). FERC's decision to leave purchaser prudence issues to the respective State commissions is predicated on the fact that the Federal Power Act only empowers FERC to review wholesale transactions for justness and reasonableness: a just and reasonable purchase may not be optimal.[2] However, FERC could choose to review wholesale purchases for justness and reasonableness and preclude further State review of the wholesale transaction on any ground.

It follows therefore that State review of purchaser prudence is limited. "[M]atters actually determined, whether expressly or impliedly, by the FERC" are clearly preempted. *Appeal of Sinclair Mach. Prods., Inc., supra* at 833. *Eastern Edison Co.* v. *Department of Pub. Utils., supra* at 298-302. Even when FERC has chosen to leave purchaser prudence inquiries to the States, it has limited those inquiries. In *Pennsylvania Power & Light Co., supra* at 61,019, FERC stated:

> "However, we note that power supply arrangements are often negotiated on a long-term basis. It requires many years to build a generating plant and the building utility must be able to rely on long-term sales contracts in making its own capacity plans just as the purchasing utility must be able to rely on long-term contracts for stability of supply. Demand forecasts may change dramatically and

---

[2] Thus, *Pike County Light & Power Co.* v. *Pennyslvania Pub. Util. Comm'n*, 77 Pa. Commw. 268, 273 (1983), and *Spence* v. *Smyth*, 686 P.2d 597 (Wyo. 1984), which hold that FERC has no power under the Federal Power Act to preempt State purchaser prudence inquiries are plainly wrong. *Appeal of Sinclair Mach. Prods., Inc.* 126 N.H. 822, 830-833 (1985), in citing both of those cases was careful not to rule out categorically the assertion of FERC jurisdiction, and articulated the rule that preemption only extends automatically to "those matters *actually determined,* whether expressly or impliedly, by the FERC" (emphasis in original).

quickly, as we have seen in recent years. The prudence of a sales arrangement, therefore, should be judged on the circumstances prevailing at the time such a contract is entered into. If a State commission, this Commission, or a utility itself could release a party to a contract from its contractual commitments simply because the contract, based on hindsight and demand forecasts in later years, no longer appears economical, the utility industry would have no supply stability or reliable basis for constructing plant. We therefore suggest that evaluation of the prudence of a 1979 power contract on the basis of 1982 demand forecasts is neither fair nor appropriate. Thus, while we commend the New Jersey Board for its concern in protecting the ratepayers within its jurisdiction, we do not believe that this protection can be at the expense of Pennsylvania ratepayers and utilities. The latter are entitled to rely on the fact that New Jersey utilities will honor their contractual commitments to purchase capacity built at least partly to fulfill their contractual demand."

Thus, FERC has made it clear that the prudence of entering a wholesale purchase contract at a particular purchase price level should be judged, not on hindsight but rather from the point of view of the time of the contract. Similarly, the prudence of entering into such a contract with particular provisions allocating operating/service responsibilities and risk of supply failure should not be judged on hindsight.

The majority, I submit, err in two ways. First, it was incumbent on the DPU to review the FERC order[3] approving the agreement (F.P.C. Docket No. E-8138) to insure that FERC had not expressly or impliedly determined that the agreement was just and reasonable from the point of view of Commonwealth Electric. Because the DPU order, D.P.U. 1003-G-6, *supra,* did not consider that FERC order at all, the case should be remanded for consideration of that order. Second, the DPU held Commonwealth Electric imputedly liable for the subsequent

---

[3] That order is not in the record.

imprudent acts of Boston Edison based on the policy, which the majority recognizes, *ante* at 368-369, that the form of the contract should not allow a company to limit its responsibility for providing service at the lowest possible cost since that would create "an untoward incentive for utilities to establish ownership forms that exempt them from liability." D.P.U. 1003-G-6, *supra* at 18 n.1. A categorical policy that accepting a contract which places the cost of the risk of supply failure on the ratepayers is imprudent ignores the myriad of factors which may or may not make entering such a bargain a prudent alternative at the time it is entered into. The DPU order does not consider the then available alternatives, in light of the purchase price, and therefore does not provide sufficient factual support for the conclusion that Commonwealth Electric was imprudent at the time it entered into the contract. The DPU order does not demonstrate, as it must, that that categorical policy, as applied in this case, did not introduce an element of impermissible hindsight. I therefore dissent. I would not reach the other objections raised by the plaintiff. I would re-mand the case to the DPU for action consistent with these two preemption precepts.