## SOUTHERN UNION COMPANY[1] *vs.* DEPARTMENT OF PUBLIC UTILITIES.

Suffolk. October 7, 2010. - February 11, 2011.

Present: IRELAND, SPINA, CORDY, BOTSFORD, & GANTS, JJ.

*Gas Company. Department of Public Utilities. Public Utilities,* Rate setting. *Contract,* Construction of contract.

Discussion of the standard of review applied by this court to an appeal from a decision of the Department of Public Utilities interpreting a rate settlement agreement. [818-820]

The Department of Public Utilities (department) erred in denying a utility's request to recover an earnings sharing adjustment under two provisions of a rate settlement agreement (agreement) among the utility, the Attorney General, and the Low-Income Energy Affordability Network, where the terms of the agreement unambiguously allowed such recovery, and where allowing such recovery would neither constitute retroactive ratemaking nor permit the utility to earn a higher return on its investment than is just and reasonable or in the public interest [820-826]; however, where the method of recovery under one section was not spelled out in the agreement, this court directed the department to address that issue on remand [826].

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on February 17, 2009.

The case was reported by *Cordy,* J.

*Robert J. Keegan* for the plaintiff.

*Sookyoung Shin,* Assistant Attorney General, for the defendant.

IRELAND, J. Southern Union Company, doing business as New England Gas Company (company), appeals from an order of the Department of Public Utilities (department) denying the company's request to recover an earnings sharing adjustment under a rate settlement agreement that it had made with the Attorney General and the Low-Income Energy Affordability Network.[2] See G. L. c. 25, § 5. A single justice of this court reserved and

---

[1]Doing business as New England Gas Company.

[2]The Low-Income Energy Affordability Network has not participated in this appeal.

reported the matter, without decision, to the full court. Because we conclude that the settlement agreement allows the company to recover the earnings sharing adjustment, we reverse and remand the matter to the single justice with instructions.

*Background.* The company distributes natural gas to customers in six communities in the Fall River and North Attleborough service areas. As of 2006, the company was experiencing a significant revenue deficiency. In June, 2006, the company filed with the department a notice of intent to file a rate case under G. L. c. 164, § 94, to obtain an increase in its distribution base rates by $7.8 million annually, beginning in 2007.[3] Approximately one year later, in June, 2007, in lieu of filing a base rate case, the company entered into a proposed settlement agreement with the Attorney General and the Low-Income Energy Affordability Network.[4] Following two public hearings, the department approved the agreement on July 31, 2007. See Southern Union Co. (New England Gas Co.), D.P.U. 07-46 (2007).

The agreement authorized the company to increase its annual base rates between August 1, 2007, and July 1, 2009, by approximately $4.2 million. Specifically, the agreement permitted the company to increase its rates by $2,200,739, beginning on August 1, 2007, and to increase them again by an additional $2 million, beginning on April 1, 2008. The agreement prohibited the company from seeking any further rate adjustment that would become

---

[3]According to its brief, the company would have proposed using 2005 as a test year. "Base rates are . . . set prospectively, based on historical data, i.e., a 'test year,' from which the gas company projects its future costs based on various estimates." *Fitchburg Gas & Elec. Light Co.* v. *Department of Telecomm. & Energy,* 440 Mass. 625, 627-628 (2004). See *Boston Edison Co.* v. *Department of Pub. Utils.,* 375 Mass. 1, 24, cert. denied, 439 U.S. 921 (1978) (under test-year method, department examines correlation of revenues, expenses, and assets over selected year on theory such figures "accurately reflect the utility's present financial situation and fairly predict the [c]ompany's future performance"). Accord *Massachusetts Elec. Co.* v. *Department of Pub. Utils.,* 383 Mass. 675, 676 n.1 (1981) (test year used "as a frame of reference against which proposed future rates may be tested for their reasonableness"). "Once established by the department, a base rate does not fluctuate with a gas company's actual costs, but only changes when the company files for, and pursuant to the procedures set out in G. L. c. 164, § 94, the department approves, a base rate change." *Fitchburg Gas & Elec. Light Co.* v. *Department of Telecomm. & Energy, supra* at 628.

[4]The company states that the delay in reaching a settlement was unrelated to the provisions of the settlement agreement.

effective before July 1, 2009, except in certain circumstances. Two of those circumstances, central to this appeal, appear in § 2.10 and § 2.11 of the agreement. Those sections appear under the heading, "Earnings Sharing and Rate Relief."

Section 2.10 provides:

> "If the Company's ROE [return on equity] for distribution service only, calculated using the earnings available for common equity and the year's average balance of common equity used in the return on common equity calculation as reported to the Department in the Company's Annual Return filed with the Department exceeds 12 percent, customers and the Company will share equally (50%/50%) in the excess. Similarly, *if the ROE were to fall below 8 percent, customers and the Company will share equally (50%/50%) in the deficiency. For any year in which the ROE is outside this bandwidth, the 50 percent portion that is to be paid to or collected from customers would be made through distribution rate adjustments in the succeeding year, and the impact of this prior year adjustment would be excluded in calculating the subsequent year's sharing.* Any adjustment under this [§] 2.10 shall be subject to investigation and a full adjudicatory hearing before the Department." (Emphasis added.)

Section 2.11 provides:

> "*For 2007 and 2008, as tested on a calendar year basis, should the Company's ROE drop 3 percent below a 10 percent ROE to 7 percent, the Settling Parties agree that the Company has the right to file a distribution base rate case.* For 2007 and 2008, as tested on a calendar year basis, should the Company's return increase 3 percent above a 10 percent ROE to 13 percent, the Attorney General may request the Department to open a rate case, which proceeding shall be commenced within 90 days from request. At least 30 days prior to the Company filing for rate relief under this article, the Company shall confer with the Attorney General and provide all work papers, calculations and assumptions supporting its ROE determination." (Emphasis added.)

Despite the company's having received a rate increase under

the agreement of $2,200,739, beginning on August 1, 2007, the company was still operating at a serious deficit in early 2008. The company reported to the department that its ROE for calendar year 2007 was negative 7.54 per cent. On July 17, 2008, the company invoked § 2.11 of the settlement agreement and filed with the department a petition for a prospective base rate increase of $5,598,982. The company arrived at the almost $5.6 million figure using 2007 as a test year.

On September 16, 2008, while the company's petition under § 2.11 was pending, the company filed a second petition with the department, invoking § 2.10. In that petition, the company sought a one-time, retrospective earnings sharing rate adjustment to recover an earnings deficiency of $4,110,329, for calendar year 2007. That $4.1 million represented fifty per cent of pretax revenues that the company would have needed in order to raise its ROE from a negative 7.54 per cent to a positive eight per cent.

The Attorney General intervened in the company's § 2.10 petition, pursuant to G. L. c. 12, § 11E (*a*).[5] She argued that the settlement agreement does not allow the company to seek relief under both § 2.10 and § 2.11 because the agreement contains no "explicit language" to that effect; that allowing the company to recover under § 2.10 for a loss in 2007 would violate the rule against retroactive ratemaking, see *Fitchburg Gas & Elec. Light Co.* v. *Department of Telecomm. & Energy*, 440 Mass. 625, 637 (2004); and that allowing recovery under both § 2.10 and § 2.11 would violate the prohibition in § 3.8 of the agreement against recovering double costs.[6] She also claimed that, where the agreement is silent on the method of recovering an earnings sharing adjustment — i.e., whether through a permanent change to ongoing base rates, or through a one-time adjustment pursuant to the local distribution adjustment factor (LDAF)[7] — and where earnings sharing adjustments in other utilities cases

---

[5]The Attorney General also intervened in the company's § 2.11 petition, but, as we shall explain, that petition is not at issue in this appeal.

[6]Section 3.8 provides, in pertinent part: "Under no circumstances shall: (1) any charge under this Settlement Agreement or tariffs promulgated hereunder recover costs that are collected by the Company more than once, or through some other rate, charge or tariff; or (2) any charge recover costs more than once in any other rate, charge or tariff collected by the Company . . . ."

[7]A local distribution adjustment factor (LDAF) is established by a local

have been accomplished through permanent base rate changes, the same method should apply here. Therefore, the Attorney General contended, the company's attempts to invoke both § 2.10 and § 2.11 are duplicative efforts to achieve the same goal: a permanent increase in base rates.

The Attorney General also challenged the company's calculation of the amount it sought to recover under § 2.10. She argued, among other things, that the company had failed to file an appropriate annual return, provide substantial evidence concerning the appropriateness of adjustments to its annual return, and normalize cost recovery for weather and the annualization of all distribution rate increases.

The company responded that the settlement agreement clearly and unambiguously allows recovery under both § 2.10 and § 2.11; that those sections "operate independently of one another, rely on different thresholds for recovery, are calculated differently, and contemplate two different types of adjustments: one temporary and one involving a more permanent change in base rates"; that recovery under § 2.10 does not constitute retroactive ratemaking because it was specifically authorized by the department in approving the settlement, and because the recovery of past costs are authorized in other circumstances, such as through cost of gas adjustment clauses, see *Fitchburg Gas & Elec. Light Co.* v. *Department of Telecomm. & Energy, supra* at 637-639; and that recovery under both sections does not violate § 3.8 because the amounts sought are not the same costs.

The company further claimed that the Attorney General's reliance on department precedent to argue that the method of applying the earnings sharing adjustment should be through a prospective change to base rates, rather than through the LDAF, is misplaced because the precedent relied on involves long-term performance based ratemaking (PBR) plans, unlike the two-year settlement agreement at issue in this case.[8] The company added

distribution adjustment clause (LDAC) tariff, which is "a mechanism that allows [a company] to recover, or credit on a fully reconciling basis, costs that have been determined to be distribution-related costs but are not included in base rates." Eastern Enters. & Colonial Gas Co., D.T.E. 98-128, at 54 n.35 (1999). In the department's order denying the company's request for an earnings sharing adjustment, the department uses LDAF and LDAC interchangeably.

[8]Performance based ratemaking (PBR) plans are "specifically structured to

that, although the LDAF would be a more workable method of accomplishing a recovery under § 2.10 because, unlike a general base rate increase, recovery under an LDAF allows for recovery of distribution-related costs on a one-time reconciling basis, the company acknowledged that the department has the authority to allow the recovery through a base rate adjustment. The company added, however, that, in such a situation, the department would have to order the rates raised and then lowered, in order to achieve the proper amount of recovery. As for the Attorney General's challenges to the company's calculation of the amount it sought to recover under § 2.10, the company denied that it had committed any error in that regard.

On February 2, 2009, the department issued two orders: (1) granting the company's request, under § 2.11, for an increase in its annual base rate by $3,675,666 (less than the $5.6 million requested), see New England Gas Co., D.P.U. 08-35 (2009); and (2) denying the company's request, under § 2.10, for an earnings sharing adjustment of $4.1 million. See New England Gas Co., D.P.U. 08-64-B (2009). The company appeals only from the second order.

In denying the company's § 2.10 petition, the department concluded that the settlement agreement contains no "clear and unambiguous language expressly permitting [the company] to pursue both the rate case [under § 2.11] and ESM [earnings sharing mechanism] recoveries [under § 2.10]." The department further reasoned, based on how ESMs had been implemented in other utilities cases involving PBR plans (although not involving settlement agreements with provisions worded like § 2.10 and § 2.11 here), that any ESM recovery under the settlement agreement is required to be "made prospectively in

change base rates on an annual basis in accordance with a pricing formula that is designed to provide utilities with adequate operating revenues over the long term and to encourage companies to implement long-term business strategies." New England Gas Co., D.P.U. 08-64-B, at 21 (2009). See Lowry, Performance-Based Regulation of Utilities, 23 Energy L.J. 399, 439 (2002) (in a PBR plan, an earnings sharing mechanism [ESM] "adjusts a company's price restrictions when its earnings rate has been in a certain range over a recent historical period. The mechanisms are established in advance of their use and typically function for several years. The most widely-used earnings rate measure is return on equity [ROE]. Approved ESMs vary significantly in several ways"). See also *id.* at 440.

base distribution rates until the [d]epartment sets new rates in a subsequent base rate case or ESM proceeding."[9] Thus, the department interpreted § 2.10 as providing a mechanism, like § 2.11, for the company to stabilize its revenues going forward, with the difference that the company could invoke § 2.10 where its ROE dropped less precipitously than would be required to invoke § 2.11 (a drop in ROE to less than eight per cent, under § 2.10, versus a drop to at least seven per cent under § 2.11).

The department explained that "[a]n ESM rate adjustment serves to protect both ratepayers and companies in a situation where a company cannot file a rate case, either because of a rate freeze, a PBR plan, or a rate settlement."[10] Because the company was in fact able to file a rate case under § 2.11, given that its ROE dropped to at least seven per cent (it dropped far lower, to negative 7.54 per cent), and because the department approved new base rates in connection with the company's petition under § 2.11, the department concluded that "the base rate adjustment in [that proceeding] supplant[ed] any need for an ESM rate adjustment. Permitting an ESM rate adjustment on top of these newly designed rates would enable the company to earn a higher return on its investment than is just and reasonable or in the public interest."

Because the department concluded that the company was entitled to no ESM recovery under § 2.10, it did not address the Attorney General's arguments that the company had miscalculated the amount of recovery that it had sought.

*Discussion.* a. *Standard of review.* Because the company's petition under G. L. c. 25, § 5, raises no constitutional questions, we review the department's decision to determine whether it is "based on an error of law, unsupported by substantial evidence, unwarranted by facts found on the record as submitted, arbitrary

---

[9]The department failed, both in its order denying the company's § 2.10 petition and in this appeal, to define an "ESM proceeding" or explain how it differs from a base rate case.

[10]The department cited no authority for its description of an ESM, and we have discovered very little discussion of the subject in pertinent sources. See note 8, *supra*. Relevant here is that the department identified no authority precluding a company from recovering both under an ESM (as under § 2.10) and under a rate case proceeding (as under § 2.11), in circumstances such as those presented in this case, i.e., where the parties have specifically contracted for such dual recoveries.

and capricious, an abuse of discretion, or otherwise not in accordance with law." *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 868 (1997), citing G. L. c. 30A, § 14 (7). "[W]e give deference to the department's expertise and experience in areas where the Legislature has delegated to it decision-making authority, pursuant to G. L. c. 30A, § 14," and "we have acknowledged that the department has broad authority to determine ratemaking matters in the public interest." *Id.* at 867, 868, and cases cited.

The Legislature has granted the department authority to approve settlement agreements of the sort in this case, and to determine the public interest in approving such agreements. See G. L. c. 164, §§ 76, 93, 94. The department argues that, because it has legislatively been authorized to *approve* the agreement at issue here, the court should defer to the department's *interpretation* of the agreement in denying the company's § 2.10 petition. The parties have identified no precedent dispositive of whether such deference is appropriate in these circumstances, nor have we discovered any. The central case that the department relies on, *Children's Hosp. Corp.* v. *Rate Setting Comm'n*, 410 Mass. 66, 68-69 (1991), is distinguishable in material respects.[11] There, the court gave deference to the rate setting commission's denial of a request for reimbursement under a hospital's contract with Blue Cross of Massachusetts not only because the commission had legislatively been charged with approving the contract, but also because, under the contract, *id.* at 68, the parties had specifically delegated to the commission the "authority to determine the intent of the parties and, in the event of a dispute, the meaning of the contract terms." *Id.* at 69.[12] No such delegation was

---

[11]The same is true of another case relied on by the department, *Commonwealth Elec. Co.* v. *Department of Pub. Utils.*, 397 Mass. 361, 367-368 (1986), cert. denied, 481 U.S. 1036 (1987). There, the department was not interpreting a rate settlement agreement but a contract between an electric company and an operator of a nuclear power station to determine whether the company shared responsibility with the power station for imprudence during a power outage. *Id.* at 362-364. The court, in essence, found that contract ambiguous, and so relied in part on the department's statements of policy rationales underlying the statutory regulatory scheme. *Id.* at 367-368. Here, for reasons we explain *infra*, the settlement agreement is not ambiguous, and therefore the *Commonwealth Elec. Co.* case is inapposite.

[12]In addition, the appeal in *Children's Hosp. Corp.* v. *Rate Setting Comm'n*,

made to the department in this case. In any event, were we to review the department's interpretation of the settlement agreement with a deferential eye, as discussed *infra*, we would still conclude that the department erred in denying the company's request to recover an earnings sharing adjustment. Cf. *Boston Police Superior Officers Fed'n* v. *Labor Relations Comm'n*, 410 Mass. 890, 892 (1991) (no deference appropriate where agency commits error of law); *Kszepka's Case*, 408 Mass. 843, 847 (1990) (incorrect interpretation of statute by administrative agency not entitled to deference). We turn now to the substance of the company's appeal.

b. *Interpretation of the settlement agreement.* The company argues that the language of § 2.10 and § 2.11 unambiguously shows that it is entitled to recover under both provisions. We agree.

Department precedent indicates that, when it is called on to interpret a rate settlement agreement, it construes the terms of the settlement — mindful of its obligation to regulate in the public interest — "to give effect to its plain language and give terms their usual and ordinary meaning," the same way a court construes a contract. See NSTAR Elec. Co. (Boston Edison Co., Cambridge Elec. Light Co., & Commonwealth Elec. Co.), D.T.E./D.P.U. 06-107-B, at 37 & nn.34-36 (2009). The court interprets a contract that is free from ambiguity according to its plain meaning. See *Freelander* v. *G. & K. Realty Corp.*, 357 Mass. 512, 516 (1970). See also *Morse* v. *Boston*, 260 Mass. 255, 262 (1927) (court must construe all words that are plain and free from ambiguity according to their usual and ordinary sense). Contract language is ambiguous "only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *Citation Ins. Co.* v. *Gomez*, 426 Mass. 379, 381 (1998). See *Fashion House, Inc.* v. *K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989) (ambiguity exists where terms are "inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken"). However, "an ambiguity is not created

---

410 Mass. 66 (1991), was commenced under G. L. c. 176A, § 5, rather than under G. L. c. 25, § 5.

simply because a controversy exists between parties, each favoring an interpretation contrary to the other." *Lumbermens Mut. Cas. Co.* v. *Offices Unlimited, Inc.*, 419 Mass. 462, 466 (1995). We conclude that the settlement agreement unambiguously allows the company to pursue recoveries under both § 2.10 and § 2.11.

Section 2.10 states that "[f]or *any year*" during the two-year period of the settlement agreement in which the company's ROE falls below eight per cent it can "collect[]" a "distribution rate adjustment[]" from its customers, with the company sharing equally with its customers in the deficiency (emphasis added). The adjustment would be made "in *the* succeeding *year*," and the impact of "*this prior year* adjustment would be excluded in calculating *the subsequent year's* sharing" (emphasis added). Because the operative words are in the singular rather than the plural, and because they refer to the recovery of a deficiency experienced in a single prior year, we conclude that § 2.10 unequivocally allows the company to recover a one-time, discrete amount for an individual past year rather than a recurring amount on a permanent, prospective basis.[13]

In contrast, § 2.11 says that if, "[f]or 2007 and 2008, *as tested on a calendar year basis*," the company's ROE drops to seven per cent, the company "has the right to file a distribution *base rate case*" (emphasis added). Unlike § 2.10, § 2.11 does not refer to the recovery of a discrete amount for a particular prior year, but rather speaks in terms of a "base rate case" premised on a test year. We conclude that, by using such terms, § 2.11 unambiguously grants the company the right, during the two-year term of the settlement agreement, to pursue a permanent, prospective, ongoing rate increase. See note 3, *supra.*

Moreover, nothing in the language of the settlement agreement suggests that the company cannot recover under both § 2.10 and § 2.11. Neither section refers to the other, and there is no express statement in the agreement that, if the prerequisites for proceeding under both sections exist — i.e., if the company's ROE drops

---

[13]Because the language of § 2.10 plainly grants the company the right to recover the deficiency that it experienced in 2007, the department's reliance on department precedent involving ESM provisions in cases involving PBR plans but not involving settlement agreements or facts comparable to this case is unavailing.

to at least seven per cent — the company is precluded from proceeding under both sections. To be sure, there also is no express statement specifically allowing the company to proceed under both sections. But no such statement is needed to conclude, as we have, that the terms of § 2.10 and § 2.11 are clear in granting the company different rights to recover different losses, and the opportunity to pursue both recoveries simultaneously. Our conclusion is bolstered by the fact that the heading under which the two sections appear declares, "Earnings Sharing *and* Rate Relief" (emphasis added), suggesting two types of simultaneous recovery available to the company.

We disagree with the department that, by using 2007 as a test year in connection with its request for a base rate increase under § 2.11, the company is precluded from recovering a share of its losses actually incurred in 2007, under § 2.10. The company's use of 2007 as a test year was not for the purpose of recovering actual losses in 2007, but — as is typical in a base rate case — for the purpose of predicting the company's future costs, and thus for setting a new base rate going forward to address those future costs (the department approved the company's petition under § 2.11, filed in 2008, for the new base rates to commence in 2009). See note 3, *supra.* See also Krieger, The Ghost of Regulation Past: Current Applications of the Rule against Retroactive Ratemaking in Public Utility Proceedings, 1991 U. Ill. L. Rev. 983, 997 (when setting rates, utility commission cannot "adjust for past losses" to the utility; although commission "may use a historical test year to calculate each component of the revenue requirement formula," the commission must "adjust those data with a view toward the utility's experience in the coming year"). Thus, the recovery that the company seeks under § 2.10 is for a loss that is not recoverable under a prospective base rate case, under § 2.11, and so the recoveries under both sections are not duplicative. Contrast *Fitchburg Gas & Elec. Light Co.* v. *Department of Telecomm. & Energy*, 440 Mass. 625, 632-633 (2004) (utility improperly included same inventory finance charges in both base rate and supplemental cost of gas adjustment clause *for same years*). For the same reason, the company's two petitions do not run afoul of § 3.8 of the agreement. See note 6, *supra.*

We reject the department's argument that allowing the com-

pany to recover under § 2.10 would constitute retroactive ratemaking. "It is well established that the department may not order retroactive adjustments (either up or down) of a gas company's base rate." *Fitchburg Gas & Elec. Light Co.* v. *Department of Telecomm. & Energy, supra* at 637, and cases cited. "The rule against retroactive ratemaking finds its source in the statutory construction of G. L. c. 164, § 94, which mandates determination by the department, after a public hearing and an investigation, of the 'propriety' of the new base rate." *Id.*, and cases cited. See *Automobile Insurers Bur. of Mass.* v. *Commissioner of Ins.*, 425 Mass. 262, 266 (1997), quoting *Attorney Gen.* v. *Commissioner of Ins.*, 370 Mass. 791, 824 (1976) (policy behind prohibition on retroactive ratemaking based in part on notion that "[r]ates frequently miss their target for the given year but prove more accurate over the longer term"; public would be "disserved by constant tinkering" with a "faulty 'past rate prediction' "). The rule thus prohibits a retroactive change to a "base rate" set pursuant to G. L. c. 164, § 94 — i.e., a retroactive change to a rate set pursuant to a company's request for "a general increase in rates." G. L. c. 164, § 94. That said, this court has determined that a retroactive adjustment to a cost of gas adjustment clause (CGAC) does not violate the rule against retroactive ratemaking because, among other things, it is not an adjustment to the base rate subject to the requirements of G. L. c. 164, § 94. See *Fitchburg Gas & Elec. Light Co.* v. *Department of Telecomm. & Energy, supra* at 638 ("Unlike the base rate, which is a calculation of rates going forward based on historical data, the CGAC adjusts semiannually for utility costs as they actually have been incurred, according to a mechanically applied technical formula"). See also *id.* at 639-640 & n.15. Cf. note 7, *supra.*

As explained above, the ESM outlined in § 2.10 of the settlement agreement, unlike § 2.11, does not provide for a general increase in base rates going forward, subject to the requirements of G. L. c. 164, § 94, but rather provides for a recovery of a discrete deficiency experienced in a prior year.[14] Compare *Attorney Gen.* v. *Department of Pub. Utils.*, 453 Mass. 191, 199

[14]At oral argument, counsel for the department asserted that § 2.11 contemplates a "full fledged" base rate case under G. L. c. 164, § 94, but

(2009) (approval of amended tariff for recovery of supply-related bad debt expense constituted general rate increase), with *Attorney Gen. v. Department of Telecomm. & Energy*, 438 Mass. 256, 268, 270 (2002) (adjustments in certain distribution rates combined with rate freeze did not constitute general rate increase). Moreover, § 2.10 is part of a settlement agreement entered into by sophisticated parties, and the department approved the agreement after two public hearings. In its approval of the agreement, the department acknowledged the two types of recovery authorized by § 2.10 and § 2.11, without a hint that simultaneous recovery was prohibited. See Southern Union Co. (New England Gas Co.), D.P.U. 07-46, at 2. Furthermore, in its order denying the company's petition under § 2.10, the department did not address whether the company's request would violate the rule against retroactive ratemaking, even though the Attorney General specifically raised that issue. See New England Gas Co., D.P.U. 08-64-B, at 18, 23-29. For these reasons, we disagree that allowing the company to recover under § 2.10 would violate the rule against retroactive ratemaking.

We also reject the notion that permitting the company to recover under § 2.10 would allow it to earn a higher return on its investment than is just and reasonable or in the public interest. Although "the function of the department is the protection of public interests and not the promotion of private interests," *Lowell Gas Light Co. v. Department of Pub. Utils.*, 319 Mass. 46, 52 (1946), a utility company "is entitled to charge rates which afford it the opportunity to meet its cost of service, including a fair and reasonable return on honestly and prudently invested capital." *Boston Gas Co. v. Department of Pub. Utils.*, 367 Mass. 92, 97 (1975). See *Lowell Gas Co. v. Department of Pub. Utils.*, 324 Mass. 80, 94, cert. denied, 338 U.S. 825 (1949); *Donham v. Public Serv. Comm'rs*, 232 Mass. 309, 326 (1919).

In approving the settlement agreement, the department stated that the agreement was "consistent with both applicable law

§ 2.10 does not. She also claimed, however, that although § 2.10 is not subject to § 94, a recovery under § 2.10 would still have to be accomplished through a base rate case, only one that is "faster" than one under § 94, and that the recovery would be made pursuant to an "ESM formula." The "ESM formula" was neither explained at oral argument, however, nor addressed in the briefs or in the settlement agreement.

and the public interest and results in just and reasonable rates." Southern Union Co. (New England Gas Co.), D.P.U. 07-46, at 9. In entering into the agreement, the company gave up the opportunity to file a base rate case in 2006, seeking an annual rate increase of $7.8 million. The company instead settled in the summer of 2007 for a phased-in annual increase of $4.2 million ($2.2 million starting on August 1, 2007, and another $2 million starting on April 1, 2008). When, in the summer of 2008, it sought a further annual increase in its base rate, through § 2.11, its ROE for 2007 was negative 7.54 per cent. The department granted an annual base rate increase of approximately $3.7 million, effective as of February 2, 2009, noting that a fair ROE for the company was 10.05 per cent. That increase under § 2.11, as explained above, was made on a prospective basis, without providing any recovery for the company's actual 2007 deficiency. To be sure, the company had received an increase in its rates beginning in 2007, through the $2.2 million increase that began on August 1, 2007. But that increase apparently did little to ensure that the company received a fair return for 2007 where, even with the August increase, the company's ROE was still negative 7.54 per cent for the year. Thus, where the company is entitled, under § 2.10, to a discrete, one-time payment to recover its 2007 deficiency, and assuming that the proper recovery amount is $4.1 million (as we discuss below, the question whether $4.1 million is the proper amount must be remanded for further proceedings before the department), there is no suggestion by the department that such an amount would raise the company's ROE for 2007 anywhere near, let alone above, 10.05 per cent.[15] Furthermore, that the company enjoyed increases to its base rate beginning in 2007, under the agreement, does not render its recovery under § 2.10 for the company's 2007 deficiency unfair or contrary to the public interest because, as we have explained, the recovery addresses a one-time, retroactive loss that is other-

---

[15]At oral argument, counsel for the company said that, even if it had received the recovery it had requested under § 2.10, it still would have received "no return on invested capital." In its reply brief, the company points out that $4.1 million plus the portion of the $2.2 million annual increase under the agreement that the company had received in 2007 — i.e., $900,000 from August 1 to December 31, 2007 — would total $5 million for 2007, still far below the $7.8 million annual increase that the company had contemplated seeking in 2006.

wise not recoverable through a forward-looking change to the company's base rate.

Finally, we note that the settlement agreement states that it is intended to resolve the company's rate setting matters "without establishing any new precedent or principle applicable to any other proceedings." In that vein, we acknowledge that the outcome of this case is dictated by the language used in the particular settlement agreement before us, and that our decision is thus limited to the particular circumstances of this case.

*Conclusion.* We conclude that the settlement agreement unambiguously grants the company the right to recover under both § 2.10 and § 2.11. We therefore reverse the department's order denying the company's petition under § 2.10. The method of recovery under § 2.10, however, is not spelled out in the agreement. The parties dispute how such a recovery may be achieved, suggesting recovery may be had through the LDAF,[16] through a short-term base rate adjustment, or through some type of ESM proceeding. See notes 9 and 14, *supra.* Because the department treated both § 2.10 and § 2.11 as involving prospective, ongoing changes to base rates, it did not address how recovery of a discrete amount for a single year may be achieved under § 2.10. We thus conclude that the manner of recovery under § 2.10 is best addressed by the department in the first instance. We remand the case to the single justice, who is directed to remand the matter to the department for further proceedings on that topic. Also, because the department originally denied the company's § 2.10 petition outright, it did not address the Attorney General's arguments that the company's calculation of the amount that it had sought to recover under § 2.10, $4.1 million, is correct. Accordingly, the single justice shall order the department to address that issue on remand.

*So ordered.*

---

[16]We note that the LDAC tariffs appended to the settlement agreement as exhibits, although not specifically addressing earnings sharing recovery, provide that "the application of the clause may, for good cause shown, be modified by the Department." The LDACs each further provide that the department "may, where appropriate, on petition or on its own motion, grant an exception from the provisions of the applicable regulations and this rate schedule, upon such terms that it may determine to be in the public interest." Moreover, each tariff states that the department can require the company to file an amended LDAF.