Lauriat, Peter M., J.
SAA Group, LLC (“SAA”) brought this action against Lenders Title Services, Inc. (“LTS”) for breach of contract in connection with LTS’s role as closing agent for Washington Mutual Bank (“WAMU”), SAA’s predecessor in interest, and the issuance of a mortgage on property located at 415 Lindsey Street, Attleboro, Massachusetts.
Lenders Title Services has now moved for summary judgment on SAA’s claims against it. For the following reasons, Lenders Title Services summary judgment motion is denied.
BACKGROUND
The pleadings, affidavits, and memoranda set forth the following facts. SAA is a Delaware limited liability company with its usual place of business in Woburn, Massachusetts. SAA is affiliated with the Ablitt Law Offices, P.C. (“Ablitt”) ofWoburn, Massachusetts. LTS is a corporation with its usual place of business in Johnston, Rhode Island.
On or about June 27, 2002, Fleet National Bank (“Fleet”) filed an Open End Mortgage in the Bristol County Registry of Deeds on property at 415 Lindsey Street in Attleboro, Massachusetts (“the Property”) to secure a $120,000 home equity line-of-credit loan it had made to Ricky and Linda Greigre. In 2003, the Greigres decided to refinance that debt with a loan from WAMU, to be secured by a mortgage on the Property, in an amount greater than the Fleet loan. To protect its interest, WAMU purchased a title insurance policy from Old Republic, through its agent, LTS, whose president is Suzanne Accardo (“Accardo”).
In advance of the closing, LTS obtained from Fleet a full pay-off amount of $120,899, for the Greigres’ home-equity loan. LTS conducted the closing of the refinancing on or about January 28, 2003, and in connection therewith, recorded WAMU’s mortgage in the Bristol County Registry of Deeds. On February 4, 2003, LTS delivered a check to Fleet in the amount of $120,899 in full payment of the Greigres’ home-equity loan. Fleet, however, did not freeze or close the Greigres’ home-equity loan and did not deliver to LTS a discharge of its mortgage. Fleet’s failures apparently allowed the Greigres to re-borrow $120,000 against their home equity line-of-credit within days of the closing. At some point after February of 2003, Bank of America, N.A. (“BOA”) acquired Fleet.
Late in 2005, the Greigres defaulted on their WAMU loan. WAMU engaged the Harmon Law Offices (“Harmon”) to foreclose on its mortgage. In conducting a title examination of the Property, Harmon noted that Fleet’s prior mortgage had not been discharged. On November 22, 2005, Harmon advised LTS of this encumbrance on the Property, and LTS in, turn, contacted BOA. On December 12, 2005, WAMU assigned the Greigres’ Note and mortgage to DLJ Mortgage Capital, Inc. (“DLJ”). In turn, DLJ engaged Select Portfolio Services, Inc. (“SPS”) to act as its attorney-in-fact and loan servicer in connection with the foreclosure of the WAMU/DLJ mortgage on the Property. SPS engaged the law firm of Ablitt & Charlton (“Ablitt”) to conduct the foreclosure proceedings on behalf of DLJ.
On January 31, 2006, in an apparent response to LTS’s inquiry, BOA executed a Discharge of Mortgage with respect to the Greigres’ 2002 Fleet home equity line-of-credit loan, and on February 14, 2006, that discharge was recorded in the Bristol County Registry of Deeds. On February 21, 2006, BOA executed a second Discharge of Mortgage with respect to the Greigres’ 2002 Fleet home equity line-of-credit loan, and on March 6, 2006, that discharge was recorded in the Bristol County Registry of Deeds. However, at the times that these mortgage discharge notices were filed, the Greigres still owed Fleet n/k/a BOA at least $120,000 on their home equity line-of-credit loan.
On March 29, 2006, BOA—asserting “clerical error and mistake”—executed a Revocation of Discharge of Mortgage, which was recorded in the Bristol County Registry of Deeds on June 30, 2006.
On November 15, 2006, BOA commenced a declaratory judgment action against the Greigres, DLJ, and another in the Bristol County Superior Court (“the Bristol Action”) seeking to void and revoke its discharge of the Fleet mortgage. On December 7, 2006, BOA recorded a Memorandum of Lis Pendens against the Property in the Bristol County Registry of Deeds. Although Ablitt and DLJ had become aware of the Bristol Action by not later than November 20, 2006, DLJ did not take any steps to defend itself in that case.
On January 4, 2007, Ablitt, representing DLJ, sent a claim letter to Old Republic informing Old Republic that “a recent title examination for the purpose of foreclosing on the said mortgage indicates that a *306 senior mortgage exists in favor of Fleet National Bank in the principal amount of $120,000.” The letter did not disclose, mention or reference the Bristol Action. Old Republic acknowledged receipt of the claim letter the same day, and, as a matter of course, issued a Future Policy Indemnity Letter in which it agreed to “issue a new policy to the successful bidder at the foreclosure sale . . . without exception for this problem.”
On February 8, 2007, BOA was awarded a default judgment in the Bristol Action, thereby restoring its mortgage to first position ahead of DLJ’s. Old Republic was not expressly informed of the Bristol Action by DU, SPS, Ablitt, or SAA until October 30, 2007. Moreover, Old Republic was not informed of BOA’s default judgment until December 12, 2007. Consequently, Old Republic was prevented from intervening in the Bristol Action and asserting a variety of viable defenses. Nonetheless, Old Republic informed DU that, should DU be successful in having the default judgment vacated, Old Republic would defend DU in the Bristol Action. DU, SPS, Ablitt, and SAA took no steps to remove the default judgment.
On or about April 15, 2008, BOA conducted a foreclosure of the Fleet mortgage, thereby extinguishing the WAMU mortgage. DU /SPS was the high bidder at the foreclosure sale and agreed to buy the property for $150,000. Ablitt paid both the bid deposit of $5,000, and the purchase price of $150,000 on behalf of DU in connection with the foreclosure sale.
On January 8, 2009, DU executed an Assignment of Claim in favor of SAA. SAA then sought indemnification under the Old Republic policy by virtue of this assignment. Old Republic refused, and the present action followed.
DISCUSSION
A motion for summary judgment shall be granted if admissible evidence “show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Mass.R.Civ.P. 56(c). The moving party must affirmatively demonstrate that there are no genuine issues of material fact in dispute. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). “This burden ... maybe satisfied by demonstrating that proof of that element is unlikely to be forthcoming at trial." Flesner v. Technical Comm. Corp., 410 Mass. 805, 809 (1991). In response, the non-moving party “must set forth sufficient facts showing that there is a genuine issue for trial.” Key Capital Corp. v. M&S Liquidating Corp., 27 Mass.App.Ct. 721, 728 (1989), quoting Mass.R.Civ.P. 56(e). A parly may not rest on “conclusoiy statements, general denials, and factual allegations not based on personal knowledge” in opposing a motion for summary judgment. LaBrecque v. Parsons, 74 Mass.App.Ct. 766, 768 (2009). When appropriate summary judgment may be entered against the moving party. Mass.R.Civ.P. 56(c).
I.
There are two separate but intertwined claims before the court, one sounding in contract and the other in tort. The first claim relates to whether LTS fulfilled its contractual obligations to WAMU despite providing clear title nearly three years after the transaction took place.[1] The second claim is whether LTS is liable in tort for failing to provide Fleet contemporaneously with (1) the Greigres’ pay-off check and (2) authorization to close the line of credit and discharge instructions. This decision addresses each potential basis for liability in turn.
A.
In assessing whether LTS breached the terms of its contract with WAMU, this court must determine what LTS’s primary obligations were under the contract. The interpretation of an unambiguous, written contract presents a question of law for the court. Hiller v. Submarine Signal Co., 352 Mass. 546, 549-50 (1950). A court must interpret an unambiguous contract according to it plain meaning. S. Union Co. v. Dep’t of Public Util., 458 Mass. 812, 820 (2011). Contract language is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Id., quoting Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998).
According to the “Lender’s Closing Instructions,” LTS was obligated to satisfy the following condition relating to the title of the Property:
[LTS] is to clear the title of all liens and encumbrances to insure that [WAMU] holds a valid first lien position . . . [and] the Policy must be free and clear of all items not accepted herein and [LTS] indemnifies and holds [WAMU] harmless from any and all costs, damages, and liability, which may result from exceptions on the title no so accepted.
Joint Appendix of Exhibits, Tab 11.
Additionally, the parties explicitly agreed that “the loan [was] scheduled to close on 2/3/2003 . . . [and] [t]he loan must close on 2/3/2003.” If the loan failed to close, “[LTS] must return all funds and documents to [WAMU].”
In Massachusetts, “parties have the right to make a stated time for performance the essence of the contract.” Porter v. Harrington, 262 Mass. 203, 207 (1928). Unless such a provision is waived by the parties, these agreements are binding on the parties, and “are given effect in equity and law.” Id.; see also Preferred Underwriters v. New York, N.H. & H.R Co., 243 Mass. 457, 463-64 (1923). In situations where parties do not indicate that time is of the essence, parties must perform within a reasonable amount of time. Id.
In the present case, the parties take differing views as to the effect of the contractual language. LTS argues that its contractual obligation to provide “clear title” *307 was satisfied the moment BOA recorded the mortgage discharge—albeit three years after the fact. LTS reasons that the recordation was conclusive evidence of the removal of the encumbrance on the Property, and that it elevated WAMU’s mortgage to first position. LTS concludes that because WAMU’s mortgage was eventually placed in first position, it cannot be found to have breached the terms of the contract.
SAA does not dispute that the recordation had the temporary effect of placing WAMU’s mortgage lien in first position. Rather, SAA argues that LTS breached the contract by failing to contemporaneously provide Fleet with (1) the Greigres’ pay-off check and (2) the Greigres’ authorization to close the line of credit and discharge the Fleet mortgage. SAA reasons that these failures allowed the line of credit to remain open just long enough to allow the Greigres to redraw against it. In turn, this failure led BOA to eventually file the Bristol Action and to undo the discharge. Additionally, SAA contends that LTS breached its contract with WAMU simply by failing, for three years, to put WAMU’s mortgage interest in first position.
Based on the parties’ arguments, the court concludes that SAA must prevail on its breach of contract claim. First, the contract plainly states that performance was due on February 3, 2003. Based on this express provision, the court concludes as a matter of law that the parties intended “time to be of the essence.”[2] Such an intent makes perfect sense within the context of the transaction because any delay could have—and did in fact—result in the very situation now at issue. Accordingly, LTS breached its contract with WAMU by failing to provide Fleet with the documentation necessary to close the line of credit and discharge the mortgage on February 3,2003. It is evident that Fleet could not possibly “close” the account without all the requisite paperwork in-hand. Failing to provide Fleet with the Greigres’ authorization to dose the account and discharge instructions until February 12, 2003 resulted in significant adverse consequences, and was a clear breach of contract.
The parties’ intent that “time be of the essence” produced an even more glaring breach—the Fleet mortgage remained undischarged for nearly three years. The fact that three years elapsed without any party taking notice or questioning LTS’s material failure, does not excuse the fact that the WAMU mortgage remained in second position. Thus, in violation of contract’s terms, the Properly remained encumbered by the Fleet mortgage long after the agreed-upon closing date, and LTS did nothing to rectify the situation. Moreover, LTS’s argument that its contractual obligation was satisfied upon BOA discharging its mortgage is unavailing. This argument ignores the three-year hiatus during which LTS ignored its contractual duty to ensure that WAMU’s mortgage was in first position. The fact that BOA was successful in having the discharge revoked only exacerbates LTS’s breach by once again encumbering the Property.
The court concludes that LTS materially breached its contract with WAMU by failing to expeditiously move to ensure that the WAMU’s mortgage enjoyed first position, and SAA is entitled to summary judgment in its favor on this claim. See Mass.R.Civ.P. 56(c).
B.
The next issue is whether LTS’s negligent performance of its contractual duties provides a simultaneous and independent basis for relief in tort. “To prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage.” Jupin v. Kask, 447 Mass. 141, 146 (2006).
The question is therefore whether LTS owed WAMU a duty of care. The court concludes that it did not. It is true that parties entering a contract are obligated to both perform the agreed-upon services and to perform those services using ordinary care. See Abrams v. Factory Mut. Liability Ins. Co., 298 Mass. 141, 143 (1937) (“When a party binds himself by contract to do a work or to perform a service, he agrees by implication to do a workmanlike job and to use reasonable and appropriate care and skill in doing it. This is true whether the work consists in building a house, repairing an automobile, treating a patient or defending against a claim or a lawsuit.”); see also Hartford Cas. Ins. Co. v. New Hampshire Ins. Co., 417 Mass. 115, 118 (1994). However, that a party might breach its contract by failing to exercise a reasonable and appropriate level of skill does not transform that contractual obligation into a special duty of care recognized in tort law. See Jupin, 447 Mass. at 146. A duty in tort “finds its source in existing social values and custom.” Mullins v. Pine Manor College, 389 Mass. 47, 51 (1983). By contrast, any obligation between contracting parties arises out of the agreement itself.
Accordingly, the court concludes that LTS did not owe WAMU any special duty of care, and therefore SAA’s negligence claim against it must fail as a matter of law.
ORDER
For the foregoing reasons, Defendants, Lenders Title Services, Inc. and Suzanne Accardo’s Motion for Summary Judgment is ALLOWED in Part and DENIED in part. Summary judgment shall enter in favor of SAA Group, LLC on its breach of contract claim against the defendants pursuant to Mass.R.Civ.P. 56(c), and summary judgment shall enter in favor of the defendants on SAA Group, LLC’s negligence claim.

Fleet’s initial mortgage discharge was subsequently voided in the Bristol Action.

The portion of the agreement setting forth the closing date provision reinforces the parties’ intent that the transaction be time sensitive. Directly preceding the “checked” box, by which the parties indicated their intent that the closing occur on 2/3/2003, there is an “unchecked” box that, if checked, would have meant that 2/3/2003 was an “estimated closing *308 date.” The juxtaposition of the two boxes (i.e. “estimated closing date” versus “firm closing date”), and the parties’ affirmative election of the latter, is dispositive as to the parties’ intent regarding time of performance.